T.C. Memo. 1995-608


UNITED STATES TAX COURT


JOHN J. BURKE AND VIVIAN BURKE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18772-93.                Filed December 26, 1995.


<u>Michael N. Balsamo</u>, for petitioner John J. Burke.

<u>Vincent R. Barrella</u>, for petitioner Vivian Burke.

<u>Catherine Chastanet</u> and <u>Mark A. Ericson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

| | | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1985 | $38,140 | $36,201 | 50 percent of the interest due on $23,388 | $5,847 |

| | | Additions to Tax | | | |
|------|------------|-----------------|--------------------|--------------------|-----------|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
| 1986 | $256,295 | $34,692 | $88,473 | 50 percent of the interest due on $113,605 | $28,401 |
| 1987 | $12,973 | -- | $12,791 | 50 percent of the interest due on $12,497 | $3,124 |

The issues for decision are: (1) Whether petitioners failed to report income of $59,648, $242,669,[1] and $50,746 on delinquent returns filed for the years 1985, 1986, and 1987, respectively; (2) whether petitioners are entitled to deduct embezzlement losses of $21,800 and $215,000 in 1985 and 1986, respectively; (3) whether petitioners are entitled to deductions of $20,253, $141,418, and $37,348 in 1985, 1986, and 1987, respectively, for ordinary losses allegedly incurred by Ard Rhei, Inc., a small business corporation (S corporation) under section 1366;[2] (4) whether petitioner John J. Burke is liable for an addition to tax for fraud[3] under section 6653(b);[4] (5) whether petitioner Vivian Burke tacitly consented to the filing of a joint Federal

---

[1]In her answer, respondent determined an increased deficiency against petitioners for 1986 in order to reflect an additional $22,448 of funds allegedly embezzled by Mr. Burke and transferred to Ard Rhei, Inc. As a result of this increased deficiency, respondent also increased the amounts of the additions to tax against petitioners for fraud, delinquent filing, and substantial understatement of income tax. This Court has jurisdiction to redetermine the correct amount of a taxpayer's deficiency even when the amount so redetermined is greater than the amount listed by respondent in her notice of deficiency. Sec. 6214(a), I.R.C. Respondent bears the burden of proof, however, with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a), Tax Court Rules of Practice and Procedure.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Respondent concedes the addition to tax for fraud against petitioner Vivian Burke for each of the years in issue. See sec. 6653(b)(4).

[4]As an alternative to the additions to tax for fraud, respondent asserts additions to tax for negligence against petitioners for each of the taxable years in issue. Because of our resolution of the fraud issue, infra, it is unnecessary for us to consider respondent's alternative arguments.

income tax return for each of the years in issue; and, if so, (6) whether Mrs. Burke is entitled to "innocent spouse" protection pursuant to section 6013(e)(1); (7) whether petitioners are liable for an addition to tax under section 6651(a)(1) for delinquent filing of their Federal income tax returns for 1986; and (8) whether petitioners are liable for an addition to tax for a substantial understatement of income tax under section 6661(a) for each of the taxable years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Setauket, New York.

I. Background

During the years in issue, Mr. Burke was a licensed insurance agent and the sole owner of two insurance brokerage agencies, John J. Burke & Associates, and Burke-Shepis & Co. (Burke Insurance Agencies).

In 1985, Mr. Burke acquired a 50-percent interest in a restaurant known as Jury's of Setauket (Jury's). Jury's was organized as an S corporation pursuant to section 1366 and operated under the name "Ard Rhei, Inc." (Ard Rhei).[5] The remaining 50-percent interest in Jury's was owned by Bernard Hillick. Mr. Burke eventually purchased Mr. Hillick's interest in Jury's.

During the years in issue, Mr. Burke frequently made large wagers at casinos and with bookmakers. In addition, Mr. Burke used cocaine and marijuana.

II. John Burke's Agreement with U.S. Life

---

[5]The names "Jury's" and "Ard Rhei" are used interchangeably throughout this opinion.

## A. The Terms of the Agreement

Mr. Burke was an agent for, and sold insurance policies issued by, the U.S. Life Insurance Co. (U.S. Life). In early 1985, Mr. Burke entered into an agreement under which U.S. Life would issue group life insurance policies to the Metropolitan Police Conference (MPC), which represented 38 Long Island Village police departments, police officers' benevolent associations, and other police and transit worker organizations.

Pursuant to his agreement with U.S. Life, Mr. Burke collected premiums from the MPC and deposited the funds into a premium account (MPC premium account) that he had established for the MPC at Marine Midland Bank in Setauket, New York. Under his agreement with U.S. Life, Mr. Burke was entitled to a 15-percent annualized commission, which he was permitted to withdraw from the MPC premium account prior to the receipt of all premiums that were due. Commissions were transferred from the MPC premium account to the expense accounts of the Burke Insurance Agencies. After withdrawing his commission, Mr. Burke was required to remit the balance of the premiums in the MPC premium account to U.S. Life. Mr. Burke had no authority to appropriate U.S. Life premium funds in excess of his commissions. Between May 1985 and May 1987, Mr. Burke collected more than $3 million in premiums from the MPC.

## B. Mr. Burke's Misappropriation of MPC Premium Account Funds

During the years at issue, JoAnn Romano was the office manager of the Burke Insurance Agencies. As such, she supervised the administrative staff, managed in-house property and casualty sales, served as a liaison to representatives of police groups and insurance companies, and handled banking matters as well as the payroll, accounts payable and receivable, and premiums that were received in the office.

Both Ms. Romano and Mr. Burke had signature authority over the MPC premium account and the Burke Insurance Agencies' expense accounts. When Mr. Burke wanted cash, he would usually arrange for office workers at the Burke

Insurance Agencies to cash checks and deliver the cash to him. He would usually instruct Ms. Romano to transfer funds from the MPC premium account to one of the Burke Insurance Agencies' expense accounts. She would then write a check that was drawn on one of these expense accounts made payable to an employee of the Burke Insurance Agencies, John J. Burke, or "cash". Checks payable to employees were cashed by the employee who would deliver the cash to Mr. Burke or a person designated by him. When Mr. Burke needed funds in excess of $10,000, he would usually instruct Ms. Romano to write multiple checks in smaller amounts so that a currency transaction report would not be generated by the bank. On some occasions, Mr. Burke ordered checks to be made payable to a bookmaker with whom Mr. Burke gambled. On several occasions, Mr. Burke instructed Ms. Romano to write a check payable to Don Balsamo who supplied Mr. Burke with cocaine. On other occasions, Mr. Burke directed Ms. Romano to transfer funds to Ard Rhei. Pursuant to Mr. Burke's instructions, Ms. Romano falsely characterized these withdrawals from the Burke Insurance Agencies' accounts as expenses, commissions, or premium refunds.

At some point, Kenneth S. Silver, the accountant for the Burke Insurance Agencies caused Forms 1099 to be issued to employees to whom checks were issued in order to obtain cash for Mr. Burke. Upon realizing this, Mr. Burke had the Forms 1099 withdrawn.

On some occasions, checks were drawn directly on the MPC account and either cashed, made payable to Ard Rhei, or paid to Mr. Burke's bookmaker. The proceeds of cashed checks, which were drawn on the MPC premium account, were delivered to Mr. Burke. Ms. Romano withdrew funds from the MPC premium account and the Burke Insurance Agencies' expense accounts only when instructed to do so by Mr. Burke.

During 1986 and 1987, the following amounts were withdrawn from the MPC premium account by checks payable to the following payees:

<u>1986</u>

| Payee | Total Amount Payable |
|---|---|
| John Burke | $120,297.61 |
| Burke & Associates | 432,823.00 |
| Burke & Associates Premium Account | 66,000.00 |
| Burke & Associates Expense Account | 122,880.00 |
| Burke-Shepis | 21,200.00 |
| Burke-Shepis Premium Account | 46,573.71 |
| Burke-Shepis Expense Account | 720.00 |
| "Cash" | 16,000.00 |
| Evelyn Coleman[1] | 550.00 |
| Jury's | 12,300.00 |
| Lisa Tobin[2] | 6,000.00 |
| Rex Wyon, Inc. | 500.00 |
| Total | $845,844.32 |

---

[1]Ms. Coleman was an employee of the Burke Insurance Agencies during the years in issue.

[2]Mrs. Tobin was the wife of Steven Tobin, a bookmaker with whom Mr. Burke gambled during the years in issue.

<u>1987</u>

| Payee | Total Amount Payable |
|---|---|
| Burke & Associates | $122,900.00 |
| Burke & Associates Premium Account | 40,000.00 |
| Burke & Associates Expense Account | 22,000.00 |
| Burke & Associates C.H.I.E. Account | 35,000.00 |
| Burke-Shepis | 23,100.00 |
| Don Balsamo[3] | 4,000.51 |
| North Island Express Ltd. & Don Balsamo | 2,100.00 |
| Total | $249,100.51 |

---

[3]Mr. Balsamo supplied Mr. Burke with cocaine during the years in issue.

Premiums due U.S. Life continued to increase throughout 1986. On April 16, 1986, Felix C. Curcuru, vice president of U.S. Life, wrote to Mr. Burke regarding premium payments of $542,894, which were overdue from the MPC. Mr. Burke had previously advised U.S. Life that the MPC premium account was in arrears because the Burke Insurance Agencies' administrative billing procedures had not been fully developed. At a meeting in May 1986, Mr. Burke informed U.S. Life that MPC premium payments were late due to billing system

problems and a misunderstanding as to the length of the "drag"[6] that U.S. Life had extended to several of the police units. In the original agreement between U.S. Life and the MPC, U.S. Life granted several of the police units a 3-month drag.

In an October 15, 1986, letter to Mr. Burke, Mr. Curcuru summarized the matters that were discussed at an October 9, 1986, meeting, including an MPC premium reconciliation presented by Mr. Burke that showed $681,079 due and unpaid to U.S. Life through October 31, 1986. At this meeting, Mr. Burke agreed to pay the amount owed by October 31, 1986, but he failed to do so. On December 15, 1986, Mr. Curcuru again wrote to Mr. Burke to demand payment in the amount of $843,670 by December 22, 1986, for unpaid MPC premiums owing from Mr. Burke through December 31, 1986. The letter further stated that if full payment were not received by December 22, 1986, U.S. Life would commence legal action to collect the unpaid premiums.

On December 24, 1986, Mr. Burke wrote to Mr. Curcuru concerning a December 2, 1986, meeting at which Mr. Burke was asked to prepare a payment schedule that would bring the MPC account current. In his letter, Mr. Burke informed Mr. Curcuru that the account "shall be brought current by April 30, 1987 with a major portion * * * being * * * [supplied] some time in January." Mr. Burke and Mr. Curcuru met again on or about December 30, 1986. At this meeting, Mr. Burke falsely claimed that he had negotiated a 6-month drag with the MPC, and he then proposed a repayment schedule, which he failed to meet.

On March 12, 1987, U.S. Life filed a Motion for Summary Judgment in Lieu of Complaint with the New York Supreme Court (County of New York) against Mr. Burke and John J. Burke & Associates. At that time, the total premiums due U.S. Life from the MPC insurance account was $1,029,096.07. On June 18, 1987, U.S. Life obtained a default judgment in the amount of $1,029,096.07, together with interest and costs of $28,300.17 and $117, respectively.

[6]A "drag" is a grace period given by an insurance company when it permits an insured to pay premiums after the specified due date.

C. Mr. Burke's Indictment

In May 1987, Mr. Burke informed Ms. Romano that he was under investigation by the New York State Department of Insurance. Mr. Burke then instructed her to collect the insurance agency checkbooks, destroy them, and report them as stolen. Ms. Romano refused to carry out these instructions.

The records of the Burke Insurance Agencies were seized by the Suffolk County District Attorney's office pursuant to search warrants authorized on May 11, 1987. Mr. Burke was indicted on two counts of grand larceny for embezzling more than $1.2 million from his insurance premium account. However, Mr. Burke was neither tried nor convicted for this indictment. Instead, pursuant to a plea agreement with the Suffolk County District Attorney, Mr. Burke pled guilty to Grand Larceny 4 (a felony) for his failure to remit sales tax from Jury's to the New York State Department of Taxation and Finance. In exchange for his guilty plea, the embezzlement charges were dismissed.

III. Tax Returns Filed for 1985, 1986, and 1987
A. The Alleged Joint Returns

On March 29, 1991, Mr. Burke filed untimely Federal income tax returns for the taxable years 1985, 1986, and 1987. These returns purport to be joint returns. Although a signature for Mrs. Burke appears on the returns at issue, the parties stipulated that Mrs. Burke did not sign any of the returns, and Mrs. Burke had no involvement in the preparation of the delinquent returns or in the audit process leading up to the issuance of the notice of deficiency. Mr. Burke signed Mrs. Burke's name to the returns without asking for or receiving her consent. Prior to the filing of the returns in issue, Mr. Burke had never signed his wife's name to a tax return.

Mrs. Burke, individually, was not required to file a Federal income tax return of her own for any of the years in issue. In March 1991, Mrs. Burke

was aware of the financial and legal problems that Mr. Burke had encountered during the years at issue.

Mr. Burke did not inform his wife that he filed the returns in issue until at least the summer of 1993, after the couple had met with attorney Michael N. Balsamo. Moreover, Mr. Burke never discussed the contents of the returns with Mrs. Burke, nor did he advise her that he had signed her name to the returns. Mrs. Burke did not learn that a signature, purporting to be her own, appeared on the returns until June 29, 1994, when she examined the returns at her attorney's office.

Mrs. Burke filed joint returns with Mr. Burke for years prior to the years in issue. Mrs. Burke personally signed these returns. Similarly, petitioners filed joint returns, which Mrs. Burke personally signed, for the taxable years 1989 through 1991.

B. Income and Losses as Reported on the Returns

The 1985, 1986, and 1987 returns filed by Mr. Burke on March 29, 1991, reported the following items:

Burke Insurance Agencies

|  | 1985 | 1986 | 1987 |
|---|---|---|---|
| Gross income | $203,961 | $350,653 | $39,900 |
| Embezzlement loss | 21,800 | 215,000 | -- |

Ard Rhei, Inc.

|  | 1985 | 1986 | 1987 |
|---|---|---|---|
| Ordinary loss | $23,453 | $141,418 | $37,348 |

Regarding these alleged losses, the following disclosure statements are contained in each of the returns for the years in issue:

> As per the direction of John J. Burke, amounts which were withdrawn from two corporations operated by Mr. Burke and attributed to him, were embezzled by two employees of these corporations during the years, 1985, 1986 and 1987. As such, these amounts have not been included as income on this tax return. Attached please find all legal papers filed to date relating to this matter.

The disclosure concerning Ard Rhei's alleged losses states:

> As per the direction of John J. Burke, amounts approximating the results of Ard Rhei, Inc.'s (S-corporation, I.D.# 11-2734819) operations have been included on the shareholders personal tax return in order to more accurately reflect the income stated on the Form 1040.  The corporation's tax return has not been filed to date.

C.    Respondent's Determination of Income

During the years in issue, the following bank accounts were maintained by petitioners and the Burke Insurance Agencies:

| Bank | Account Title | Account no. |
|------|--------------|-------------|
| Bank of Smithtown | John J. Burke or Vivian Burke | 164002479 |
| Bank of Smithtown | John J. Burke & Associates Expense Account | 134014141 |
| Bank of Smithtown | John J. Burke & Associates Premium Account | 134014133 |
| Bank of Smithtown | Burke-Shepis and Co., Inc. | 134014166 |
| Marine Midland | John J. Burke & Associates MPC Premium Account | 921133120 |
| Marine Midland | John J. Burke & Associates | 921119747 |
| Marine Midland | John J. Burke & Associates Premium Account | 921119755 |
| Marine Midland | John J. Burke & Associates C.H.I.E. Account | 921692978 |
| Marine Midland | John J. Burke & Vivian Burke | 921119763 |
| Marine Midland | Burke-Shepis & Co. Inc. Expense Account | 928127753 |

Relying on certain transactions with respect to the above accounts, respondent determined that petitioners' gross receipts for the years in issue were as follows:

| 1985 | 1986 | 1987 |
|------|------|------|
| $263,609 | $570,874 | $90,646 |

In her answer, respondent asserted an increased deficiency of $22,448 for 1986 based upon additional funds that were transferred from Marine Midland Bank--account no. 921-11974-7 to Ard Rhei, but which had not been included in income pursuant to the notice of deficiency.[7]

The banking transactions upon which respondent's notice of deficiency and claimed increase in deficiency are based are summarized[8] as follows:

| Bank Name | Account Number | Account Title | Transaction Type | 1985 | 1986 | 1987 |
|-----------|----------------|---------------|------------------|------|------|------|
| Marine Midland | 921-13312-0 | John J. Burke & Assoc. MPC Premium A/C | checks to Balsamo, John Burke, cash, Jury's, and Tobin | | $41,800.00 | $4,000.51 |
| Marine | 921-69297-8 | John J. Burke | cash | $53,500.00 | 50,500.00 | 31,400.00 |

---

[7]The claimed increased deficiency is based upon the following checks drawn on Marine Midland Bank account no. 921-11974-7 (John J. Burke & Associates):

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 06/02/86 | 1472 | $5,000 | Ard Rhei/Jury's |
| 11/18/86 | 1739 | 2,500 | Ard Rhei |
| 11/19/86 | 1742 | 2,500 | Ard Rhei |
| 12/01/86 | 1750 | 1,548 | Ard Rhei |
| 12/03/86 | 1753 | 3,200 | "For Deposit Only" |
| 12/11/86 | 1761 | 4,300 | Ard Rhei |
| 12/16/86 | 1770 | 2,200 | Ard Rhei |
| 12/23/86 | 1781 | 1,200 | Ard Rhei |
| Total | | $22,448 | |

[8]A description of specific transactions upon which this summary is based is contained in the Appendix.

| Bank | Account No. | Account Name | Description | | | |
|---|---|---|---|---|---|---|
| Midland | | & Assoc. C.H.I.E. A/C | withdrawals | | | |
| Marine Midland | 921-11974-7 | John J. Burke & Assoc. | checks to Ard Rhei/ Jury's, John Burke, and cash | 23,658.95 | 413,038.00 | 20,540.00 |
| Bank of Smithtown | 01-3-401414-1 | John J. Burke & Assoc. Expense A/C | checks to cash, John Burke, and employees | 7,500.00 | | |
| Bank of Smithtown | 01-6-400247-9 | John J. Burke or Vivian Burke | checks to cash, Ard Rhei, and John Burke | 66,900.00 | | |
| Marine Midland | 921-11976-3 | John J. Burke & Vivian Burke | noncash deposits | 112,050.00 | 87,984.00 | 34,706.07 |
| Total income | | | | $263,609.00 | $593,322.00 | $90,646.00 |

OPINION

Additional Income

Respondent determined that Mr. Burke failed to report income in the amount of $59,648, $242,669,[9] and $50,746 on the delinquent returns that he filed for 1985, 1986, and 1987, respectively, and that the source of this income was money that Mr. Burke diverted from U.S. Life premium funds. Mr. Burke contends that the amounts in question constituted either loans from U.S. Life[10] or money that was embezzled by his employees.

_____

[9]This includes $22,448 in addition to the amount determined in the notice of deficiency. See supra note 1.

[10]We note the inconsistencies in Mr. Burke's position. On brief, Mr. Burke admitted that he "often withdrew sums in excess of his actual commission entitlement [and that] [s]uch excess withdrawals were treated * * * [as] loans due from Mr. Burke to the Life insurance company." However, when asked by respondent at trial if he characterized his use of MPC account funds as loans, Mr. Burke denied even using funds from the premium accounts. Nevertheless, when questioned again about this issue later in the trial by his own counsel, Mr. Burke explained: "They [U.S. Life] had the option of treating it [Mr. Burke's withdrawal of funds in excess of his commissions] like a loan, okay. They, however, never exercised that option. They never charged me any interest."

The determinations in respondent's notice of deficiency are presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 61(a) defines gross income to include "all income from whatever source derived". In addition, the Supreme Court has determined that gross income includes all "'accessions to wealth, clearly realized, and over which the taxpayers have complete dominion'", including illegal earnings. James v. United States, 366 U.S. 213, 219 (1961) (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)); accord Rutkin v. United States, 343 U.S. 130, 137-138 (1952); Ianniello v. Commissioner, 98 T.C. 165, 173 (1992).

Borrowed funds are not included in the taxpayer's gross income "because the taxpayer's obligation to repay the funds offsets any increase in the taxpayer's assets". United States v. Centennial Sav. Bank FSB, 499 U.S. 573, 582 (1991); accord Moore v. United States, 412 F.2d 974, 978 (5th Cir. 1969); United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967). The hallmarks of a loan are: (1) Consensual recognition between the borrower and the lender of the existence of the loan, i.e., the obligation to repay; and (2) bona fide intent on the part of the borrower to repay the funds advanced. Collins v. Commissioner, 3 F.3d 625, 631 (2d Cir. 1993), affg. T.C. Memo. 1992-478.

There is no credible evidence in the record of any loan agreement between U.S. Life and Mr. Burke. Rather, the evidence clearly establishes that Mr. Burke was obligated to place all MPC premiums in a special premium bank account. From this account, Mr. Burke was permitted to withdraw his 15-percent annualized commission, but he was obligated to remit the remaining amounts to U.S. Life. Mr. Burke never received permission from U.S. Life to take any amounts from the MPC premium account in excess of his commissions. When U.S. Life realized it was not receiving its portion of the premiums in a timely fashion, it made inquiries and demanded payment. Mr. Burke responded with false statements and never told U.S. Life that he had "borrowed" the money from the premium account. Eventually, U.S. Life brought suit and obtained a judgment against Mr. Burke.

As to Mr. Burke's allegation that his employees embezzled funds from him and his insurance agencies, we find that no such embezzlement took place. The employees whom Mr. Burke accuses of embezzlement were credible witnesses at trial. They explicitly denied receipt of any of the money in question. As we have already stated in our findings of fact, these employees were operating under Mr. Burke's instructions when they withdrew funds from the MPC premium account and the accounts of the Burke Insurance Agencies. Such funds were either given to Mr. Burke, transferred to Ard Rhei, or otherwise dispersed on Mr. Burke's behalf. For example, on several occasions, funds were used to satisfy Mr. Burke's gambling debts[11] or to pay persons who supplied Mr. Burke with illegal drugs.[12]

We conclude that Mr. Burke improperly diverted funds for his own personal use without the consent of U.S. Life,[13] and these funds are, therefore, includable in his gross income. See James v. United States, supra at 219. Accordingly, we sustain respondent's determination that Mr. Burke had unreported income for the years in issue. We also conclude that respondent has presented sufficient evidence to carry her burden of proof regarding the increased deficiency for 1986. We note that the amounts, which should have been paid to U.S. Life during the years in issue, actually exceed the income amounts determined by respondent.

Embezzlement Losses

Mr. Burke argues that he is entitled to deductions for losses of $21,800 and $215,000 in 1985 and 1986, respectively, as a result of the embezzlement

---

[11]For instance, a check was drawn on the MPC premium account and made payable for $6,000 to Lisa Tobin, the wife of a bookmaker with whom Mr. Burke gambled.

[12]Another check was made payable for $4,000.51 to Don Balsamo. Mr. Burke purchased cocaine from Mr. Balsamo during the years in issue.

[13]Sufficient evidence exists to explain petitioners' need for funds well in excess of the income reported on the returns at issue. Petitioners lived in an expensive house, incurred significant home improvement expenses, paid for their son's college tuition and provided him with an automobile and insurance coverage. Mr. Burke also purchased illegal narcotics and gambled heavily.

of funds by employees of the Burke Insurance Agencies. Taxpayers bear the burden of proving that they are entitled to the losses they claim. Burnet v. Houston, 283 U.S. 223, 227 (1931).

Mr. Burke testified at trial that Ms. Romano and Evelyn Coleman, employees of the Burke Insurance Agencies, embezzled funds from him. In particular, Mr. Burke claims that these women would write checks payable to him, endorse the checks in his name, and then keep the funds for themselves. Both Ms. Romano and Ms. Coleman denied these accusations. Ms. Romano testified that she would write and endorse checks in Mr. Burke's name only when instructed to do so by Mr. Burke himself, and she would always provide him with the funds she received.

As already explained, we believe that Mr. Burke's allegations are nothing more than an attempt to conceal his diversion of funds for his own personal use. Therefore, we sustain respondent's disallowance of any embezzlement losses for the years in issue.

Schedule E Losses

Mr. Burke claimed Schedule E (Supplemental Income Schedule) losses of $23,453, $141,418, and $37,348 for the taxable years 1985, 1986, and 1987, respectively. Mr. Burke alleges that these losses were sustained by Ard Rhei, his wholly owned S corporation. With the exception of a $3,200 deduction for 1985, respondent disallowed any deduction for these losses.

An S corporation is not normally subject to corporate income tax. Sec. 1363(a). Instead, shareholders include their pro rata share of the corporation's income, losses, deductions, or credits on their individual tax returns. Sec. 1366(a)(1). Shareholders are only entitled to claim losses and deductions to the extent of their adjusted basis in the corporation's stock and any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1).

Petitioners bear the burden of proving that the corporation actually incurred losses for the years in issue. Our review of the record convinces us that petitioners have failed to do so in this case.

There are several reasons for our conclusion. First, the record does not contain Ard Rhei's income tax returns for the years in issue.[14] Second, Mr. Burke failed to offer sufficient documentation to substantiate that Ard Rhei incurred the losses for which Mr. Burke claimed deductions. Aside from the unconvincing testimony of Mr. Burke and his accountant, the record only contains Ard Rhei's general ledger for 1985. This ledger, without more, is insufficient to substantiate these losses. Finally, a disclosure statement in each of the returns for the years in issue demonstrates the uncertainty regarding these loss deductions. These disclosures state:

> As per the direction of John J. Burke, amounts approximating the results of Ard Rhei, Inc.'s (S-corporation, I.D.# 11-2734819) operations have been included on the shareholders personal tax return in order to more accurately reflect the income stated on the Form 1040. The corporation's tax return has not been filed to date. [Emphasis added.]

Because Mr. Burke has failed to substantiate that Ard Rhei incurred any losses for the years in issue, we sustain respondent's determination.

Additions to Tax for Fraud

We must next consider whether Mr. Burke is liable for additions to tax for fraud under section 6653(b) for the taxable years 1985, 1986, and 1987. Respondent bears the burden of proof on this issue. Sec. 7454(a). For the taxable year 1985, if any portion of an underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment as well as an amount equal to 50 percent of the interest payable under section 6601 with respect to that portion of the underpayment attributable to fraud. Sec. 6653(b)(1) and (2). For the taxable years 1986 and 1987, the addition to tax is equal to 75

---

[14]Kenneth S. Silver, Mr. Burke's accountant, testified that he prepared these returns only a few weeks before trial.

percent of the portion of any underpayment attributable to fraud, plus 50 percent of the interest due on this portion.  If respondent establishes that any portion of an underpayment for 1986 and 1987 is attributable to fraud, then the entire underpayment is to be treated as attributable to fraud, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud.  Sec. 6653(b)(1)(A) and (B).

In order to discharge her burden, respondent must prove that:  (1) An underpayment exists for the years in issue; and (2) that the underpayment is due to fraud.  Sec. 7454(a); Rule 142(b); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Habersham-Bey v. Commissioner, 78 T.C. 304, 311 (1982).

Respondent's income determination is based on the diversion of funds from the MPC premium account for Mr. Burke's personal benefit.  Mr. Burke does not deny that funds belonging to U.S. Life were taken from the MPC premium account.  Instead, Mr. Burke claims that funds, which were in excess of what was properly due to the Burke Agencies as commissions, were either loans from U.S. Life or were funds embezzled by several of Mr. Burke's employees.

We have previously found that none of the withdrawn funds that should have been paid to U.S. Life constituted loans.  U.S. Life neither explicitly nor implicitly consented to lend Mr. Burke any of the funds withdrawn from the MPC premium account.  Mr. Burke could not have misapprehended this situation. He neither sought nor received U.S. Life's permission to borrow money.  U.S. Life continuously requested payment of amounts to which it was entitled.  In response, Mr. Burke provided numerous false explanations to U.S. Life. Finally, in 1987, U.S. Life brought suit and obtained a judgment against Mr. Burke for the unpaid premiums.

With respect to Mr. Burke's claim that his employees embezzled funds, we have already explained why we reject this claim.  The evidence clearly demonstrates that Mr. Burke used his employees to divert funds from the MPC premium account by instructing them to move money out of that account and give it to him or transfer it to Ard Rhei and others for his benefit.

Mr. Burke engaged in a scheme to divert funds for his own benefit.  We reject his claims that the funds, which he should have paid to U.S. Life, were either loans or embezzlements by his employees.  Respondent's determination of Mr. Burke's gross receipts for the years in issue is actually less than the total amount of premiums that was owed to U.S. Life as of March 1987.  Respondent has clearly demonstrated that Mr. Burke failed to report income and erroneously claimed deductions for embezzlement losses.  Consequently, respondent has clearly proven the underpayment of income tax for the taxable years in issue.

Next, respondent must show that Mr. Burke intended to evade taxes known to be owing by conduct that was designed to conceal, mislead, or otherwise prevent the collection of such taxes.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is never imputed or presumed.  Instead, it must be affirmatively established by respondent with clear and convincing evidence.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  However, since direct evidence of a taxpayer's intent is rarely available, fraud may be proven with circumstantial evidence and reasonable inferences which are drawn from established facts.  Spies v. United States, 317 U.S. 492, 500 (1943); Rowlee v. Commissioner, supra.

Factors which are indicative of fraudulent intent on the part of a taxpayer include:  (1) Understatements of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) engaging in illegal activities; (8) attempting to conceal these activities; and (9) dealing in cash.  Bradford v. Commissioner, 796 F.2d

303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Recklitis v. Commissioner, 91 T.C. 874, 911 (1988). Upon examination of the entire record, we conclude that Mr. Burke's underpayment of Federal income taxes for 1985, 1986, and 1987 is attributable to fraud.

Mr. Burke substantially understated his income on the delinquent returns for the taxable years in issue. Such consistent and substantial understatement of income constitutes strong evidence of fraudulent intent. Grudin v. Commissioner, 536 F.2d 295, 296 (9th Cir. 1976), affg. T.C. Memo. 1974-251; Ruark v. Commissioner, 449 F.2d 311, 313 (9th Cir. 1971), affg. T.C. Memo. 1969-48; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Otsuki v. Commissioner, 53 T.C. 96, 107-108 (1969).

The failure by a knowledgeable taxpayer to maintain adequate records is also evidence of fraud. Galant v. Commissioner, 26 T.C. 354, 364-365 (1956). There were no adequate records kept to reflect the nature of the transactions in issue. Mr. Burke held several insurance licenses and had extensive experience in the insurance business. He was obviously aware, therefore, of the need to maintain adequate books and records. His accountant repeatedly warned him of the inadequacy of the Burke Insurance Agencies' books and records. For instance, in a letter to Mr. Burke dated June 19, 1986, Mr. Silver states:

> Over the past year or so it has become extremely difficult to properly account for the results of operations for both companies. In addition to no longer having an idea of how much you owe to insurance companies for premiums collected, I have to seriously question your position that your draw is nothing more than loans from the company to you.

Failure to file Federal income tax returns may be persuasive circumstantial evidence of fraudulent intent. Marsellus v. Commissioner, 544 F.2d 883, 885 (5th Cir. 1977), affg. T.C. Memo. 1975-368; Castillo v. Commissioner, 84 T.C. 405, 409 (1985); Grosshandler v. Commissioner, 75 T.C.

1, 19 (1980).  Mr. Burke did not file the returns for the taxable years in issue until March 29, 1991.  Mr. Burke filed delinquent returns only after being contacted by a revenue agent.  Mr. Burke also failed to file sales tax returns for Jury's with the New York State Department of Taxation and Finance.

Misleading a taxpayer's return preparer also constitutes evidence of fraud.  Parsons v. Commissioner, 43 T.C. 378, 395 (1964).  Mr. Burke made numerous misrepresentations to Mr. Silver, his accountant.  For instance, he informed Mr. Silver that his withdrawals of MPC premiums were loans.  However, we have already determined that no loan agreement existed between Mr. Burke and U.S. Life and that his diversion and use of these premiums were made without the knowledge and consent of U.S. Life.  In addition, when delinquent returns were prepared, Mr. Burke directed Mr. Silver to deduct embezzlement losses for funds that he alleged had been misappropriated by Ms. Romano and Ms. Coleman.  Nevertheless, the record contains no evidence establishing that either individual embezzled any funds from the Burke Insurance Agencies and, after reviewing the entire record, we are convinced that the embezzlement alleged by Mr. Burke did not take place.

The destruction of books or records to conceal finances is persuasive evidence of fraud.  Spies v. United States, 317 U.S. at 499; Reynolds v. Commissioner, T.C. Memo. 1977-181.  Mr. Burke instructed Ms. Romano to destroy insurance agency checkbooks and report them as stolen after he learned that he was under investigation by the New York State Department of Insurance.  Ms. Romano did not carry out Mr. Burke's instructions.

The omission of income and the commission of other criminal acts are additional indicia of fraud.  Petzoldt v. Commissioner, 92 T.C. at 701-702. Pursuant to a plea agreement with the Suffolk County District Attorney, Mr. Burke pleaded guilty to Grand Larceny 4, a felony under New York law, for failing to file sales tax returns and to remit sales taxes owed from Jury's to the New York State Department of Taxation and Finance.  We have also determined that Mr. Burke diverted premiums owing to U.S. Life.  As the Court

of Appeals for the Sixth Circuit remarked long ago in <u>Rogers v. Commissioner</u>, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938): "It is a fair inference that a man who will embezzle funds in his charge will not hesitate to understate his income with intent to defraud the Government."

A system of fraudulent bookkeeping entries by the owners of a business combined with substantial understatements of income is evidence of fraud. <u>Chesbro v. Commissioner</u>, 21 T.C. 123, 130 (1953), affd. 225 F.2d 674 (2d Cir. 1955). Mr. Burke instructed Ms. Romano to transfer funds from the MPC premium account to the Burke Insurance Agencies' expense accounts and to draw checks payable to herself, John J. Burke, various other employees, or "cash". The checks would be cashed, and the funds delivered to Mr. Burke. Pursuant to Mr. Burke's instructions, Ms. Romano recorded these withdrawals from the expense accounts as premium refunds and expenses.

A taxpayer's excessive dealings in large amounts of cash is further indication of fraud. <u>Estate of Mazzoni v. Commissioner</u>, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37. Mr. Burke diverted insurance premiums by having his employees cash checks and deliver the proceeds to him. In order to conceal his receipt of cash, Mr. Burke instructed Ms. Romano to write checks for amounts less than $10,000 in order to avoid generating a currency transaction report.

We conclude that the record contains clear and convincing evidence of Mr. Burke's fraudulent intent to evade income taxes for the taxable years in issue. Accordingly, we find that respondent has discharged her burden, and we sustain her determination that Mr. Burke is liable for an addition to tax for fraud.

Respondent computed the addition to tax for fraud on only a portion of the underpayment for each year.[15] However, with respect to the addition for 1986, respondent's answer asserts an increased addition to tax for fraud by

_____

[15]For purposes of applying this addition to tax, the "underpayment" is not reduced by any amount of tax reported on a delinquently filed return. Sec. 6653(c).

alleging that the tax on an additional understatement of income in the amount of $22,448 is also due to fraud.  This additional understatement of income is based on evidence establishing that it was part and parcel of the overall diversion of funds to Mr. Burke.  As such, it is part of the overall fraud. We therefore sustain the increased addition to tax resulting from the increased deficiency for 1986.

Alleged Joint Returns

The next issue for decision is whether Mrs. Burke is jointly liable for the deficiencies in tax.  This initially depends upon whether Mrs. Burke tacitly consented to the filing of joint Federal income tax returns for the years in issue.  If we find that she did, then section 6013(d)(3), which establishes that spouses who file a joint tax return are jointly and severally liable for any tax that is due on the return, is applicable.

Mrs. Burke did not personally sign the alleged joint returns at issue. However, this Court has recognized that a joint return is not necessarily invalid because one spouse did not sign the return.  Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971); Federbush v. Commissioner, 34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); Heim v. Commissioner, 27 T.C. 270, 273 (1956), affd. 251 F.2d 44 (8th Cir. 1958).  The issue turns on whether the spouse "intended to file and be bound by the particular return in question."  Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part, revg. in part, and remanding T.C. Memo. 1984-310; accord Januschke v. Commissioner, 48 T.C. 496, 500 (1967); Helfrich v. Commissioner, 25 T.C. 404, 407 (1955).  Once it is established that one spouse did not sign the joint return, the burden shifts to respondent to produce additional evidence of that spouse's intent.  O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), affg. in part and revg. in part T.C. Memo. 1967-174; Estate of Krock v. Commissioner, T.C. Memo. 1983-551.

Respondent relies primarily on petitioners' long history of joint filing and Mrs. Burke's reliance on her husband to handle the couple's financial affairs. Cf. Estate of Campbell v. Commissioner, supra at 13; Federbush v. Commissioner, supra at 756-757. Indeed, Mrs. Burke concedes on brief that

> [Mr.] Burke was responsible for the preparation of any necessary tax returns, and that Vivian was not involved in the preparation process; that Vivian signed and consented to the filing of the Prior Year Returns; and that Vivian signed and consented to the filing of Subsequent Year Returns. [Fn. ref. omitted.]

However, Mrs. Burke contends, and we agree, that a pattern of joint return filing is only one factor to consider in reaching a decision concerning her intent. Lomanno v. Commissioner, T.C. Memo. 1994-426.

Mrs. Burke argues that the outcome in this case is controlled by our decision in Helfrich v. Commissioner, supra. In Helfrich v. Commissioner, 25 T.C. at 407, we held that the taxpayer did not have the requisite intent to file a joint return with her spouse because

> The signature * * * on the return is not hers. Furthermore, she did not authorize anyone to sign her name to the return; she did not know the return had been filed; she did not participate in its preparation; and the first time she saw it was in the collector's office * * *

Mrs. Burke was not aware that her husband filed returns for the years in issue on March 29, 1991, and had she been asked to sign these returns or consent to joint filing status, she would have refused. Numerous reasons existed for Mrs. Burke not to consent to the filing of joint returns. Mrs. Burke was not personally required to file any returns for the years at issue. The years at issue were turbulent ones for petitioners. Mr. Burke was a heavy gambler, and he was abusing cocaine. Mrs. Burke knew that Mr. Burke had been indicted for embezzlement during 1987, that he had pleaded guilty to Grand Larceny 4, a felony in New York, and that U.S. Life had obtained a default judgment against him for the premiums he diverted. The returns in question

were filed long after their due dates, at which time the Burkes were experiencing severe marital problems.

Respondent relies on Estate of Campbell v. Commissioner, supra, in support of her contention that Mrs. Burke tacitly consented to the filing of the returns for the taxable years in issue. In that case, this Court determined that the taxpayer, whose signature did not appear on the return in question, nevertheless intended her return to be a joint return. Estate of Campbell v. Commissioner, 56 T.C. at 12. We based our conclusion on the fact that the taxpayers "customarily" filed joint returns, and Mrs. Campbell did not examine her husband's preparation of the returns. Rather, she simply signed the returns after he completed them. Id. at 12-13. Since her signature on prior and subsequent tax returns appeared to have been little more than a "formal ritual", we concluded that the absence of Mrs. Campbell's signature was not of "overriding importance". Id. at 13. Moreover, the Court noted:

> Here, it has not even been suggested that * * * [the taxpayer] refused to sign the 1964 return. Indeed, * * * [the taxpayer] has offered no evidence whatever of a reason of any kind for not filing a joint return in 1964. Far from suggesting marital difficulties, the record indicates that after 1964 the spouses continued to live together, filing joint returns and enjoying the benefits of their economic community until Mr. Campbell's death in 1967. [Id. at 13-14; citations omitted].

We find Estate of Campbell v. Commissioner, supra, to be clearly distinguishable from the case at hand. Mrs. Campbell was fully aware that the tax return at issue had been filed as a joint return. She was also involved in the audit process. Thus, she had the opportunity to raise an objection to the joint filing of the return, but chose not to. Id. at 14. Consequently, the Court considered her subsequent effort to discredit the return to be merely an "afterthought". Id. By contrast, Mrs. Burke was not involved in the audit process leading up to the issuance of the notice of deficiency. She was unaware that the IRS was seeking to hold her liable for any taxes relating to the years at issue until she and Mr. Burke met with attorney Michael N.

Balsamo in the summer of 1993. Prior to this time, Mrs. Burke was unaware that purported joint Federal income tax returns had been filed.

We conclude that Mrs. Burke did not tacitly consent to the filing of joint Federal income tax returns for the years in issue, and, therefore, she is not jointly and severally liable for the tax[16] in issue. It follows that Mr. Burke's Federal income tax liability for 1985, 1986, and 1987 must now be computed under the filing status of "married filing separate".

## Addition to Tax for Failure to File a Timely Return

Mr. Burke filed a delinquent return for the taxable year 1986, and respondent determined that he is liable under section 6651(a)(1) for an addition to tax on the portion of the underpayment that is not due to fraud. See sec. 6653(d).

Mr. Burke bears the burden of proof on this issue; however, he did not address this issue on brief, and there is no evidence that would lead us to conclude that he had a reasonable excuse for not filing his 1986 return until March 29, 1991. We sustain respondent's determination.

## Additions to Tax for Substantial Understatement of Income Tax

Respondent determined that Mr. Burke is liable for additions to tax for 1985, 1986, and 1987 under section 6661. Respondent also alleged in her answer that this addition to tax applies to the understatement of tax attributable to the additional income of $22,448 that we have found that Mr. Burke received in 1986. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). An understatement is substantial if it exceeds the greater of $5,000

---

[16]Since we have determined that Mrs. Burke did not tacitly consent to the filing of joint Federal income tax returns, we need not consider whether she satisfies the requirements for protection under the innocent spouse provision in sec. 6013(e).

or 10 percent of the tax required to be shown on the return. Sec.
6661(b)(1)(A). An amount may be reduced, however, if the taxpayer shows that
there was substantial authority for such treatment of the item, or that the
relevant facts affecting the tax treatment of the item are adequately
disclosed on the return or in a separate statement attached to the return.
Sec. 6661(b)(2)(B). Respondent's determinations are presumed correct, and Mr.
Burke bears the burden of proving otherwise. Rule 142(a); Hall v.
Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337;
Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Kerr v. Commissioner, T.C.
Memo. 1990-155.

Mr. Burke did not address this issue on brief. We sustain the additions
to tax pursuant to section 6661 as determined in the notice of deficiency and
hold that Mr. Burke is also liable for this addition to tax with respect to
the understatement of tax attributable to additional income of $22,448, which
we have found for 1986.

Decision will be entered

under Rule 155.

APPENDIX

1.  Marine Midland Bank account no. 921-13312-0  (John J. Burke & Associates MPC
Premium Account)


1986

Checks payable to cash

| Date | Check no. | Amount | Endorsement |
|---|---|---|---|
| 01/30/86 | 1002 | $5,000 | Joann Romano (Romano) |
| 02/06/86 | 1004 | 5,000 | Lisa Whelan (Whelan) |
| 02/19/86 | 1007 | 6,000 | Whelan |
| Total | | $16,000 | |

Checks payable to Lisa Tobin

| 03/27/86 | 1022 | $6,000 | Lisa Tobin (Tobin) |
|---|---|---|---|
| Total | | $6,000 | |

Checks payable to Jury's of Setauket

| 07/14/86 | 1059 | $10,400 | Jury's of Setauket (Jury's) |
|---|---|---|---|
| 08/18/86 | 1074 | 1,900 | Jury's |
| Total | | $12,300 | |

Checks payable to John J. Burke (cashed)

| 03/12/86 | 1016 | $6,500 | John Burke (Burke) & Whelan |
|---|---|---|---|
| 04/04/86 | 1026 | 1,000 | Burke |
| Total | | $7,500 | |

TOTAL 8612     $41,800


1987

Checks payable to Don Balsamo

| 02/12/87 | 1149 | $4,000.51 | Don Balsamo (Balsamo) |
|---|---|---|---|
| Total | | $4,000.51 | |

TOTAL 8712     $4,000.51

2.  Marine Midland Bank account no. 921-69297-8  (John J. Burke & Associates
C.H.I.E. Account)


  Cash Withdrawals

                          1985

    Date          Amount          Withdrawal Signature

  06/24/85       $5,000                   Burke
  07/10/85        5,000                   Burke
  08/01/85        7,000                   Burke
  09/16/85        9,500                   Burke
  09/23/85        5,000                   Burke
  09/30/85       15,000                   Burke
  10/03/85        7,000                   Burke

  Total         $53,500


                          1986

  04/16/86       $9,000                   Burke
  04/17/86       20,000                   Burke
  04/23/86        9,000                   Burke
  04/25/86        8,000                   Burke
  05/21/86        4,500                   Burke

  Total         $50,500


                          1987

  01/09/87       $9,900                   Burke
  01/23/87        4,000                   Burke
  01/27/87        1,000                   Burke
  01/29/87        5,000                   Burke
  03/03/87        2,000                   Burke
  04/28/87        3,500                   Burke
  04/30/87        6,000                   Burke

  Total         $31,400


3.  Marine Midland Bank account no. 921-11974-7  (John J. Burke & Associates)


                          1985

  Checks payable to John J. Burke

    Date        Check no.       Amount       Endorsement

  11/27/85        1220          $1,000       Burke & Whelan
  12/06/85        1234          10,000       Burke
  12/20/85        1255           6,000       Burke

    Total                       $17,000

Checks payable to cash

| | | | |
|---|---|---|---|
| 12/16/85 | 1247 | $5,000 | Whelan |
| 12/18/85 | 1250 | 500 | Whelan |

Total                 $5,500

Checks payable to Jury's of Setauket

| | | | |
|---|---|---|---|
| 10/30/85 | 1191 | $1,158.95 | Jury's |

Total                 $1,158.95

TOTAL 8512    $23,658.95


## 1986

Checks payable to John J. Burke

| | | | |
|---|---|---|---|
| 02/27/86 | 1308 | $6,500 | Burke & Romano |
| 02/28/86 | 1309 | 6,500 | Burke & Romano |
| 03/14/86 | 1360 | 1,000 | Burke & Alvin Koenigberg (Koenigberg) |
| 03/26/86 | 1369 | 9,000 | Burke & Whelan |
| 04/02/86 | 1373 | 6,000 | Burke |
| 04/03/86 | 1374 | 5,000 | Burke & Romano |
| 04/09/86 | 1383 | 9,000 | Burke & Whelan |
| 04/10/86 | 1411 | 9,000 | Burke |
| 04/10/86 | 1412 | 9,000 | Burke |
| 04/10/86 | 1413 | 3,000 | Burke |
| 04/21/86 | 1418 | 1,000 | Burke & Romano |
| 06/04/86 | 1474 | 8,000 | Burke |
| 06/06/86 | 1475 | 9,000 | Burke & Whelan |
| 06/06/86 | 1478 | 4,500 | Burke & Whelan |
| 06/11/86 | 1489 | 8,000 | Burke & Romano |
| 06/11/86 | 1491 | 8,000 | Burke & Evelyn Coleman (Coleman) |
| 06/24/86 | 093 | 5,700 | Burke |
| 07/01/86 | 094 | 1,190 | Burke & Romano |
| 07/03/86 | 1506 | 9,000 | Burke & Coleman |
| 07/07/86 | 1511 | 9,000 | Burke & Whelan |
| 07/16/86 | 1518 | 6,000 | Burke & Whelan |
| 07/18/86 | 1522 | 9,000 | Burke |
| 07/25/86 | 1529 | 4,000 | Burke & Coleman |
| 08/08/86 | 1557 | 9,900 | Burke |
| 08/22/86 | 1582 | 9,000 | Burke |
| 09/05/86 | 1605 | 5,000 | Burke |
| 09/10/86 | 1616 | 2,000 | Burke & Coleman |
| 09/18/86 | 1641 | 1,500 | Burke & Coleman |
| 09/19/86 | 1644 | 21,000 | Burke |
| 09/24/86 | 1649 | 1,000 | *illegible* |
| 09/26/86 | 1654 | 8,500 | Burke & Coleman |
| 10/10/86 | 1657 | 1,000 | Burke |
| 10/03/86 | 1661 | 1,000 | Burke & Coleman |
| 10/14/86 | 1691 | 1,000 | Burke & Gena Cohen (Cohen) |
| 10/15/86 | 1692 | 6,000 | Burke & Coleman |
| 10/16/86 | 1696 | 500 | Burke |
| 10/21/86 | 1701 | 1,000 | Burke & Romano |
| 10/30/86 | 1712 | 9,000 | Burke & Romano |
| 11/20/86 | 1743 | 9,000 | Burke & Lynda Aquilina (Aquilina) |
| 11/25/86 | 1745 | 1,600 | Burke & Aquilina |
| 11/26/86 | 1746 | 3,000 | John Burke for Deposit to Ard Rhei |
| 11/26/86 | 1748 | 500 | Burke & Aquilina |
| 12/11/86 | 1764 | 7,000 | Burke & Aquilina |
| 12/18/86 | 1771 | 9,400 | Burke |

```
12/19/86      1765             2,000      Burke
12/19/86      1773             3,000      Deposit to Ard Rhei
12/19/86      1774             2,000      Burke & Coleman
12/22/86      1777             2,000      Burke & Coleman
12/23/86      1778               700      Burke

Total                       $263,990

Checks payable to cash

07/02/86      1501           $1,500      Whelan
07/03/86      1502            1,500      Whelan

Total                         $3,000

Checks payable to Jury's/Ard Rhei, Inc.

06/02/86      1472           $5,000      Ard Rhei/Jury's
07/09/86      1510            1,000         ---
07/16/86      1516            2,000      Jury's
07/21/86      1525            5,000      "For Deposit Only"
07/28/86      1545            5,000      "For Deposit Only"
08/04/86      1561            2,000      "For Deposit Only"
08/11/86      1567            2,800      Jury's
08/26/86      1587            2,200      Jury's
09/03/86      1598            1,300      Jury's
09/26/86      1653            5,600      "For Deposit Only"
10/01/86      1656            1,500         ---
10/08/86      1665            9,700         ---
10/21/86      1702            2,000      Jury's
10/28/86      1710            2,300      Jury's
11/04/86      1714            4,000      Jury's
11/06/86      1717            1,000      Jury's
11/06/86      1718           70,000      Jury's
11/07/86      1722            1,500      Jury's
11/12/86      1724            3,700      Jury's
11/14/86      1737            1,000      Jury's
11/18/86      1739            2,500      Ard Rhei
11/19/86      1742            2,500      Ard Rhei
12/01/86      1750            1,548      Ard Rhei
12/03/86      1753            3,200      "For Deposit Only"
12/11/86      1761            4,300      Ard Rhei
12/16/86      1770            2,200      Ard Rhei
12/23/86      1781            1,200      Ard Rhei

Total                       $146,048

              TOTAL 8612    [4]$413,038
```

---

[4]This figure includes the increased deficiency asserted by respondent in her answer.

<u>1987</u>

Checks payable to John J. Burke

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 01/05/87 | 1783 | $7,000 | Burke & Aquilina |
| 01/22/87 | 1811 | 1,000 | Burke & Aquilina |
| 02/05/87 | 1825 | 2,000 | Burke & Aquilina |
| 02/09/87 | 1829 | 2,000 | Burke |
| 02/13/87 | 1836 | 1,000 | Burke |
| 02/19/87 | 1881 | 1,000 | Burke & Aquilina |
| 02/20/87 | 1886 | 1,200 | Burke & Coleman |
| 02/27/87 | 1892 | 1,000 | Burke & Howard Kornahins (Kornahins) |
| 03/06/87 | 1899 | 2,000 | Burke & Aquilina |
| 03/11/87 | 1902 | 1,000 | Burke |
| 07/06/87 | 1987 | 500 | Burke & Cohen |

Total                          $19,700

Checks payable to cash

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 07/13/87 | 1990 | $840 | Burke & Aquilina |

Total                          $840

                    TOTAL  8712  $20,540

4.  <u>Bank of Smithtown account no. 01-3-401414-1  (John J. Burke & Associates Expense Account)</u>

<u>1985</u>

Checks payable to cash

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 08/05/85 | 1427 | $1,000 | Whelan |

Total                          $1,000

Checks payable to Phyllis Cox

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 04/09/85 | 1360 | $500 | Phyllis Cox (Cox) |

Total                          $500

Checks payable to John J. Burke

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 06/07/85 | 1384 | $1,000 | Burke & Karen Vitteritti (Vitteritti) |

Total                          $1,000

Checks payable to Joann Romano

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 02/25/85 | 1298 | $5,000 | |

Total                          $5,000

                    TOTAL  8512  $7,500

5.  Bank of Smithtown account no. 01-6-400247-9  (John J. Burke or Vivian Burke

                          1985

Checks payable to cash

| Date | Check no. | Amount | Endorsement |
|------|-----------|--------|-------------|
| 01/08/85 | 1129 | $1,700 | Burke |
| 01/15/85 | 1134 | 6,000 | Burke |
| 02/07/85 | 1144 | 4,500 | Burke & Anna M. Vogel (Vogel) |
| 02/27/85 | 1148 | 700 | Burke & Vogel |
| 03/22/85 | 1157 | 1,000 | Burke & Cox |
| Total | | $13,900 | |

Checks payable to John J. Burke

| 02/15/85 | 1145 | $18,000 | Burke & Romano |
|----------|------|---------|----------------|
| Total | | $18,000 | |

Checks payable to Ard Rhei, Inc.

| 01/28/85 | 1139 | $35,000 | --- |
|----------|------|---------|-----|
| Total | | $35,000 | |

                    TOTAL  8512  $66,900

6.  Marine Midland Bank account no. 921-11976-3  (John J. Burke & Vivian Burke)

                      1985

Deposits

| Date | Amount | Cash/Non-cash |
|------|--------|---------------|
| 01/15/85 | $3,000 | |
| 02/07/85 | 8,000 | |
| 03/25/85 | 4,000 | |
| 04/12/85 | 4,000 | |
| 04/30/85 | 2,000 | |
| 05/10/85 | 3,000 | $2,650 cash |
| 05/14/85 | 2,000 | |
| 06/04/85 | 3,000 | |
| 06/20/85 | 400 | 400 cash |
| 06/25/85 | 5,000 | |
| 07/03/85 | 500 | |
| 07/15/85 | 5,500 | |
| 07/16/85 | 7,000 | |
| 07/19/85 | 5,000 | |
| 08/09/85 | 4,500 | |
| 08/22/85 | 20,000 | |
| 08/23/85 | 5,000 | 5,000 cash |
| 08/29/85 | 1,500 | |
| 09/16/85 | 3,500 | 3,500 cash |
| 09/18/85 | 3,700 | |
| 09/23/85 | 3,000 | 3,000 cash |
| 10/09/85 | 5,000 | |
| 11/07/85 | 15,000 | |
| 11/22/85 | 1,000 | |

```
12/03/85              12,000
12/09/85               5,000                    5,000 cash

TOTAL DEPOSITS             $131,600

TOTAL CASH DEPOSITS         $19,550

NET DEPOSITS 8512          $112,050


                          1986

Deposits

01/08/86            $4,000                 $4,000 cash
01/15/86             7,500                  4,500 cash
01/22/86             2,390                  2,390 cash
01/24/86             3,500                  3,500 cash
02/19/86             5,000
03/12/86             5,000
04/15/86             5,000
05/05/86             1,800                  1,800 cash
05/08/86             4,000                  4,000 cash
05/13/86             3,400                  3,100 cash
05/20/86             8,000                  8,000 cash
05/21/86             2,000
06/06/86             7,500                  7,500 cash
06/24/86             5,700
06/27/86               600                    600 cash
07/17/86             4,500
07/24/86             6,500
07/30/86               200
08/12/86            15,000
08/14/86             3,000
09/02/86            10,000
10/01/86               784
10/08/86             8,000
11/07/86             6,500
11/26/86             1,300
12/01/86               200
12/04/86             6,000

TOTAL DEPOSITS            $127,374

TOTAL CASH DEPOSITS        $39,390

NET DEPOSITS              $87,984


                          1987

Deposits

01/07/86            $6,700.00
02/06/87             5,000.00
03/02/87               300.00
03/03/87             5,000.00
03/25/87               500.00
04/08/87             5,000.00
04/15/87             1,600.00
05/19/87             5,000.00            $5,000.00 cash
06/12/87            10,606.07
07/08/87             2,740.71             2,740.71 cash
07/24/87             1,500.00             1,500.00 cash

TOTAL DEPOSITS            $43,946.78

TOTAL CASH DEPOSITS        $9,240.71

NET DEPOSITS  8712        $34,706.07
```