T.C. Memo. 1998-78


UNITED STATES TAX COURT


WILLIAM HENRY SUNDEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4620-94.          Filed February 25, 1998.


William Henry Sundel, pro se.

<u>Michael P. Breton</u> and <u>Bradford A. Johnson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following deficiency in and additions to petitioner's income tax for 1983:

| | Additions to Tax | | |
| Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661(a) |
| $1,581,128 | $790,564 | [1] | $395,282 |

[1]Plus 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment which is attributable to fraud.

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect for 1983.

After concessions, the issues remaining for decision are:  (1) Whether, and to what extent, petitioner realized unreported income in 1983 from the sale of marijuana; (2) whether petitioner is liable for self-employment tax on the income earned from the sale of marijuana; (3) whether petitioner is entitled to deduct expenses allegedly incurred during 1983 for legal services; (4) whether petitioner is liable for the additions to tax for fraud prescribed by section 6653(b)(1) and (2); (5) whether petitioner is liable for the addition to tax for substantial understatement of liability prescribed by section 6661(a); and (6) whether the period of limitations on assessment and collection of tax prescribed by section 6501 expired before respondent issued the subject notice of deficiency.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Portsmouth, Rhode Island, at the time he filed his petition in this case. He is a high school graduate but has no other formal education.

Sometime prior to August 1983, petitioner entered into a conspiracy with Messrs. Victor Lubiejewski, Frank Nelson, Robert Bonalewicz, Gilbert Cabeceiras, Joel Pinkard, and a person called "Ricardo" to purchase a large quantity of marijuana from wholesalers in Colombia, South America, for distribution in the United States. The purpose of the conspiracy was to earn a profit from the sale of the marijuana. Petitioner had become acquainted with his co-conspirators several years earlier through his involvement in another drug smuggling operation known as the "Hot Tubs case".

Petitioner and his coconspirators arranged for a shipment of approximately 51,000 pounds of Colombian marijuana to be delivered by boat to a location in or near Atlantic City, New Jersey, in early to mid August 1983.

At that time, the average wholesale price of Colombian marijuana was approximately $16 per pound.

Petitioner and several of his coconspirators traveled to Atlantic City on or about August 9, 1983, to wait for the marijuana to arrive. While he was waiting, petitioner received a downpayment of $1 million from Mr. Dennis Erickson. Mr. Erickson made this payment to secure his promise to purchase a large portion of the marijuana for approximately $280 per pound.

The boat containing the marijuana arrived at a dock in or near Atlantic City on or about August 14, 1983. Petitioner and his coconspirators paid $500,000 to the captain of the boat, Mr. Gilbert Cabeceiras, for his services.

Shortly after the boat arrived in New Jersey, petitioner sold approximately 3,000 or 3,500 pounds of the marijuana to unrelated individuals for approximately $300,000. Petitioner and his coconspirators also gave some portion of the marijuana to individuals related to the conspiracy. The remaining marijuana, approximately 43,000 pounds, was loaded onto a tractor-trailer for transport to Kalamazoo, Michigan, where it was to be weighed and delivered to Mr. Erickson.

The tractor-trailer containing the marijuana arrived in the Kalamazoo area on or about August 15, 1983. On the same day, petitioner and several coconspirators, including Messrs. Lubiejewski and Nelson, traveled to Kalamazoo on a private jet to supervise and assist in unloading and weighing the marijuana and to receive payment of a portion of the purchase price from Mr. Erickson. Another of petitioner's coconspirators, Mr. Bonalewicz, unloaded the tractor-trailer and placed the marijuana on scales so that it could be weighed. Mr. Nelson personally observed all of the marijuana as it was unloaded. He recorded the weight of each bale and the total number of bales unloaded in a notebook which he maintained on petitioner's behalf. Mr. Erickson purchased at least 37,000 pounds of the marijuana that was shipped to the Kalamazoo area. That amount was the gross weight of the marijuana as shipped and included approximately 5,000 pounds of wrapping and packaging material. Mr. Erickson later returned approximately 7,000 pounds of the marijuana because it was wet and unmarketable.

Petitioner and Messrs. Lubiejewski, Nelson, and Bonalewicz and several other individuals involved in the conspiracy remained in Michigan for a short period

after the marijuana arrived there. During this time, the coconspirators received a large amount of cash from Mr. Erickson in exchange for marijuana. Mr. Bonalewicz left the Kalamazoo area 3 or 4 days after the marijuana arrived there. Petitioner and Mr. Lubiejewski left on August 20, 1983, to travel to New York. Mr. Nelson remained in Kalamazoo for 9 to 11 days thereafter to supervise the transfer of the marijuana to Mr. Erickson and to accept and record the related cash payments. Mr. Nelson recorded these additional cash payments in a notebook and stored the cash on behalf of petitioner and Mr. Lubiejewski.

Petitioner returned to the Kalamazoo area on August 22, 1983, to take some of the cash Mr. Nelson had received up to that time. Petitioner again returned on August 28, 1983, after the transaction with Mr. Erickson was completed. At the time of petitioner's second trip to the Kalamazoo area, he and Mr. Nelson packed the remaining cash receipts into bags and traveled on a private jet to New York City. Upon arriving in New York, petitioner and Mr. Nelson went to petitioner's mother-in-law's house and counted the cash they had transported from Michigan. This cash totaled in excess of $4.5 million. Mr. Nelson helped

petitioner deposit a portion of the cash into several safe deposit boxes and bank accounts in petitioner's name in New York City.

In total, Mr. Erickson paid in excess of $7 million for the marijuana he purchased from petitioner and his coconspirators. Petitioner divided the proceeds of the transaction equally with Mr. Lubiejewski.

While in New York City, after the transaction with Mr. Erickson was completed, petitioner spent approximately $8,000 to $10,000 in cash for lodging at the Helmsley Palace Hotel. Petitioner also spent $45,000 to lease an apartment and approximately $100,000 to purchase an Aston-Martin sports car. At petitioner's request, Mr. Nelson made several deposits of approximately $9,500 each into brokerage accounts in petitioner's name. Petitioner instructed Mr. Nelson to limit the amount of each deposit to avoid the filing of Currency Transaction Report forms with the Internal Revenue Service. At petitioner's request, Mr. Nelson also delivered cash payments of $40,000 to $50,000 each to various individuals in payment of gambling debts. In addition, petitioner paid a man named Ricardo approximately $250,000 to satisfy a debt that petitioner had incurred in the Hot Tubs case.

Petitioner invested some of the proceeds from the Michigan transaction in legitimate business ventures. Sometime after the transaction, petitioner purchased a going concern known as Village Imports which was in the business of importing and converting "grey market" automobiles for sale in the United States. Petitioner also invested approximately $250,000 in a facility known as Ben Boat Basin. At petitioner's request, Mr. Nelson used approximately $100,000 of the cash that petitioner had received from the Michigan transaction to purchase equipment to be used in petitioner's various business ventures. Petitioner also used a portion of the proceeds to purchase gold Krugerrands.

Petitioner had originally agreed to pay Mr. Nelson $100,000 for his participation in the marijuana smuggling operation. However, because petitioner earned more than twice what he had expected to earn from the transaction, he paid Mr. Nelson approximately $200,000.

On August 11, 1988, petitioner was indicted in the United States District Court for the Western District of Michigan and charged with the following offenses in connection with his involvement in the transaction described above: (1) Conspiracy to possess with intent to

distribute and distributing in excess of 1,000 pounds of marijuana; (2) possession with intent to distribute and distributing in excess of 1,000 pounds of marijuana; and (3) conspiracy to import marijuana. On April 27, 1989, petitioner entered a plea of guilty to the first count of the indictment, conspiracy to possess with intent to distribute and distributing in excess of 1,000 pounds of marijuana. The remaining counts were dismissed pursuant to a plea agreement with the U.S. Attorney.

During a plea hearing in his criminal case, petitioner testified that he had engaged in a conspiracy with several individuals to distribute and sell marijuana, and that the purpose of this conspiracy was to earn a profit from the sale of marijuana. Petitioner also testified that he flew from New Jersey to Michigan on a private jet on August 15, 1983, before traveling to New York City on August 20, 1983. Petitioner further testified that he returned to Kalamazoo, Michigan, on August 22, 1983, and again on August 28, 1983. Petitioner admitted that during the time he was in Michigan, he received cash payments which he estimated totaled "hundreds of thousands" of dollars. He also admitted that during his third and final trip to Michigan

on August 28, 1983, Mr. Erickson paid him "a lot of money", which he estimated may have been more than $1 million.

Petitioner filed a timely Federal income tax return for 1983. On his return, petitioner reported adjusted gross income of $53,504.99, consisting primarily of wages from his employment with the Key Container Corp. in Pawtucket, Rhode Island. Petitioner did not report any income from the sale of marijuana on his 1983 return, and he did not inform his return preparer of the Michigan transaction or the existence or extent of the income realized from the transaction.

OPINION

Unreported Income

As a general rule, gross income includes "all income from whatever source derived". Sec. 61(a). This includes income obtained from illegal sources. See James v. United States, 366 U.S. 213 (1961); Browning v. Commissioner, T.C. Memo. 1991-93; sec. 1.61-14(a), Income Tax Regs. Respondent determined that petitioner realized $3,158,000 of unreported income in 1983 from the sale of marijuana. Petitioner, on the other hand, maintains that he did not realize any such income.

Throughout his posttrial briefs, petitioner repeatedly asserts that respondent failed to prove that he realized unreported income.  In effect, petitioner argues that respondent bears the burden of proving that he realized unreported income from the marijuana transaction in 1983. As a general rule, the Commissioner's determination of a tax deficiency is presumptively correct, and the taxpayer bears the burden of proving that it is erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  All Rule references are to the Tax Court Rules of Practice and Procedure.

Courts recognize a limited exception to this general rule in cases such as this where the Commissioner's notice of deficiency determines that the taxpayer failed to report income derived from illegal activities.  See Petzoldt v. Commissioner, 92 T.C. 661, 688 (1989); see also Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985); Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), affg. in part and revg. in part 74 T.C. 260 (1980); Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Dellacroce v. Commissioner, 83 T.C. 269, 287 (1984).  In such cases, the notice of deficiency will be considered lacking a rational basis and not entitled to

the presumption of correctness, unless there is some reasonable foundation for the determination. E.g., Erickson v. Commissioner, 937 F.2d 1548, 1551 (10th Cir. 1991), affg. T.C. Memo. 1989-552; Rapp v. Commissioner, supra at 935; Llorente v. Commissioner, supra at 156; Weimerskirch v. Commissioner, supra at 360-361. The reasonable foundation may consist of evidence linking the taxpayer with an income-producing activity such that it can be inferred that the taxpayer received income from the activity, see, e.g., Weimerskirch v. Commissioner, supra at 360, or it may consist of evidence showing an ownership interest in assets possessed by the taxpayer, see, e.g., Erickson v. Commissioner, supra at 1551-1552. Once the Commissioner has demonstrated sufficient minimal facts to link the taxpayer with an income-producing activity or to show an ownership interest in assets possessed by the taxpayer, the presumption of correctness arises, and the taxpayer has the burden to rebut the presumption by establishing by a preponderance of the evidence that any deficiency determination is arbitrary or erroneous. See Erickson v. Commissioner, supra at 1551-1552; Rapp v. Commissioner, supra; Petzoldt v. Commissioner, supra at 689.

In this case, respondent has produced more than adequate substantive evidence linking petitioner to income from the sale of marijuana in 1983.  This includes petitioner's criminal conviction arising from the Michigan transaction, petitioner's own testimony during the plea hearing in the criminal case, testimony of law enforcement officers, and detailed testimony of coconspirators.  Indeed, petitioner stipulates that he was engaged in the sale of marijuana during 1983.  Under the circumstances, we find that respondent has more than satisfied respondent's initial burden of producing some substantive evidence connecting petitioner with an income-producing activity, and we find that the burden of disproving respondent's determination of unreported income remains with petitioner.

We also sustain respondent's calculation of the amount of petitioner's unreported income.  Section 6001 requires all taxpayers to maintain sufficient records to determine their correct tax liability.  See Petzoldt v. Commissioner, supra at 686.  If a taxpayer fails to maintain or does not produce adequate books and records, the Commissioner is authorized by section 446 to reconstruct the taxpayer's income.  See sec. 446(b); Petzoldt v. Commissioner, supra

at 686-687; <u>Bratulich v. Commissioner</u>, T.C. Memo. 1990-600.
The Commissioner's reconstruction need only be reasonable
in light of all the surrounding facts and circumstances.
See <u>Petzoldt v. Commissioner</u>, <u>supra</u> at 687; <u>Giddio v.</u>
<u>Commissioner</u>, 54 T.C. 1530, 1533 (1970); <u>Schroeder v.</u>
<u>Commissioner</u>, 40 T.C. 30, 33 (1963).

Respondent calculated petitioner's unreported
income on the basis of the amount of marijuana sold to
Mr. Erickson, approximately 37,000 pounds.  Respondent
deducted 5,000 pounds for wrapping and packaging material
and 7,000 pounds to allow for the marijuana that
Mr. Erickson returned as wet and unusable.  Respondent,
thus, determined that Mr. Erickson purchased a total of
25,000 pounds of usable marijuana.

Respondent found that petitioner and Mr. Lubiejewski
sold the marijuana to Mr. Erickson for approximately $280
per pound.  Based on a net weight of 25,000 pounds of
marijuana sold, respondent calculated the gross receipts
from the sale as $7 million.  Because these receipts were
split equally between petitioner and Mr. Lubiejewski,
respondent determined that petitioner's gross receipts were
$3,500,000.

Finally, respondent reduced petitioner's gross receipts by the cost of petitioner's share of the marijuana. Respondent computed the cost of goods sold by first determining that petitioner and his coconspirators had paid $16 per pound to purchase the marijuana from the Colombian wholesalers. Respondent derived this amount from information provided by the Drug Enforcement Administration regarding the average wholesale price of Colombian marijuana during the period in question. Respondent next increased the wholesale price of the marijuana by $11.36 per pound. This is the amount that petitioner and his co-conspirators had paid to Mr. Cabeceiras, the boat captain, for transporting approximately 44,000 pounds of marijuana from South America to New Jersey ($500,000 ÷ 44,000 pounds = $11.36 per pound). The record does not explain why respondent allocated the boat captain's fee to 44,000 pounds of marijuana. In any event, respondent determined that the sum of these amounts, $27.36, is the total cost of goods sold, computed on a per-pound basis. Respondent determined that the cost of the marijuana sold by petitioner is $342,000 (i.e., 12,500 pounds x $27.36). Reducing petitioner's portion of the gross receipts by the cost of goods attributable to his portion of the marijuana,

respondent determined that petitioner realized $3,158,000 from the transaction.

Petitioner does not dispute certain factual assumptions made by respondent in calculating the gross receipts from the Michigan transaction.  In fact, petitioner agrees that a total of 25,000 pounds of marijuana was sold to Mr. Erickson for an average price of $280 per pound.  Petitioner argues that respondent made three errors in computing petitioner's income.  First, petitioner argues that he and his coconspirators paid $80 per pound to the Colombian wholesalers for the marijuana. Second, petitioner maintains that his gross receipts from the Michigan transaction should be reduced for expenditures not reflected in respondent's calculation.  Finally, petitioner maintains that the proceeds of the transaction were divided three ways, rather than two as determined by respondent.

The following schedule compares petitioner's computation of his net profit from the transaction with respondent's:

|  | Petitioner's Computation | | Respondent's Computation | |
|---|---|---|---|---|
| Gross pounds of marijuana sold to Mr. Erickson |  | 37,000 |  | 37,000 |
| Net pounds of marijuana |  | 32,000 |  | 32,000 |
| Pounds of marijuana returned |  | (7,000) |  | (7,000) |
|  |  | 25,000 |  | 25,000 |
| Split |  | 33% |  | 50% |
| Petitioner's share |  | 8,333 |  | 12,500 |
| Sale price per pound |  | $280 |  | $280 |
| Gross receipts |  | $2,333,240 |  | $3,500,000 |
| Math error |  | ($840) |  | -- |
|  |  | $2,332,240 |  | $3,500,000 |
| Advance from Coco Joe |  | $95,000 |  | -- |
| Petitioner's gross receipts |  | $2,427,400 |  | $3,500,000 |
| Petitioner's share of marijuana | $8,330 |  | $12,500.00 |  |
| Cost per pound | ($80) |  | ($27.36) |  |
|  |  | ($666,400) |  | ($342,000) |
| Petitioner's gross profit |  | $1,761,000 |  | $3,158,000 |
| Amount paid to Nelson | ($250,000) |  | -- |  |
| Amount paid to Bonalewicz | ($250,000) |  | -- |  |
| Amount paid to boat captain | ($500,000) |  | -- |  |
| Amount paid to unloaders | ($250,000) |  | -- |  |
| Amount paid for dock | ($250,000) |  | -- |  |
|  | ($1,500,000) |  | -- |  |
|  | 50% |  | 50% |  |
| Petitioner's share |  | ($750,000) |  | -- |
| Amount paid for prior transaction ("Hot Tubs) | ($550,000) |  |  | -- |
| Amount unpaid by purchaser ("Erickson Owes") | ($758,000) |  | -- |  |
|  | 50% |  | 50% | -- |
|  | ($379,000) |  |  |  |
| Driver, Detroit to NY | ($50,000) |  | -- |  |
| Scales | ($10,000) |  | -- |  |
| Planes | ($12,500) |  | -- |  |
| Conveyor belts | ($6,700) |  | -- |  |
|  | ($79,200) |  | -- |  |
|  |  | ($1,758,200) |  | -- |
| Petitioner's net profit |  | $2,800 |  | $3,158,000 |

We agree with respondent's calculation of petitioner's unreported income. First, petitioner has not satisfied his burden of proving that he and his coconspirators paid $80 per pound for the marijuana, rather than $16 as determined by respondent. The only evidence that petitioner presented to support his position is Mr. Nelson's testimony that the cost of the marijuana may have been as much as $80 per pound. We found Mr. Nelson's testimony in this regard to

be vague and uncertain and not sufficient to rebut respondent's determination.

Second, we reject petitioner's argument that his gross receipts should be reduced by additional expenditures not reflected in respondent's calculation. These expenditures consist of various fees allegedly paid to individuals involved in the drug smuggling operation, including individuals responsible for unloading the boat after it arrived in New Jersey and the owner of the dock where the boat was unloaded, and amounts allegedly paid to satisfy debts from previous drug transactions. In passing, we note that in his calculation of net profit set out above, petitioner deducts $550,000 as an amount paid to satisfy a debt arising from the Hot Tubs case. However, petitioner testified during his plea hearing in the criminal case that he paid only $250,000.

Section 280E provides that no deduction or credit shall be allowed for any expenditure paid or incurred in carrying on a trade or business which consists of trafficking in controlled substances. See sec. 280E; S. Rept. 97-494, at 309 (1982). Marijuana is a controlled substance as defined in section 280E. See <u>Browning v.</u>

<u>Commissioner</u>, T.C. Memo. 1991-93; <u>Bratulich v. Commis-</u>
<u>sioner</u>, T.C. Memo. 1990-600.

In this case, petitioner does not address respondent's position that the additional expenditures are subject to section 280E and are not deductible, nor does petitioner argue or present any reason to conclude that the additional expenditures should be treated as an exclusion from gross income on account of cost of goods sold. See <u>Franklin v.</u> <u>Commissioner</u>, T.C. Memo. 1993-184. We therefore reject petitioner's contention that the receipts from the Michigan transaction should be reduced by such expenditures.

Finally, we reject petitioner's assertion that the proceeds of the marijuana transaction were split three ways rather than two, as determined by respondent. Petitioner bases this assertion on his own testimony and that of Mr. Bonalewicz. However, petitioner admitted during his plea hearing in the criminal case that he split the proceeds equally with Mr. Lubiejewski. Moreover, Mr. Bonalewicz testified that he had a limited role in the transaction, and that he was present in Michigan for only 3 to 4 days after the marijuana arrived there. Given the nature of his involvement in the transaction, we find that

Mr. Bonalewicz's testimony regarding the division of proceeds is not credible.

Moreover, we note that petitioner has made numerous inconsistent statements regarding the amount of money he earned from the subject transaction. On July 25, 1990, petitioner testified in the case of United States v. Paul Nathaniel Hankish, CR 8900235, in the U.S. District Court for the District of West Virginia, that he "ended up with $1.5 million". During a November 6, 1991, meeting with Revenue Agent Jeff Silva and his supervisor, petitioner admitted that he earned a profit of $227,000 and an additional $550,000 which he used to satisfy previously incurred debt. On a third occasion, petitioner admitted to Drug Enforcement Administration Agent John Peterson that he and Mr. Lubiejewski made a net profit on several drug smuggling operations, including the August 1983 transaction in Michigan. At trial in the instant matter, however, petitioner claimed that he did not earn any money from the transaction.

We are not obligated to accept a taxpayer's self-serving, improbable, uncorroborated testimony. See Quock Ting v. United States, 140 U.S. 417 (1891); Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per

curiam T.C. Memo. 1969-159.  We find petitioner's testimony in this case to be wholly incredible.  Based upon all of the foregoing, we sustain respondent's determination that petitioner realized at least $3,158,000 of unreported income in 1983 from the sale of marijuana.

Self-Employment Tax

Respondent determined that petitioner is liable for the self-employment tax prescribed by section 1401.  Section 1401(a) imposes a tax "on the self-employment income of every individual".  Self-employment income is defined generally as "net earnings from self-employment", which in turn is defined as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".  Sec. 1402(a) and (b).

Section 1402(c) provides that the term "trade or business" as used in this regard "shall have the same meaning as when used in section 162 (relating to trade or business expenses)".  This includes an illegal trade or business such as selling illegal drugs.  See Petzoldt v. Commissioner, 92 T.C. at 698; Johnson v. Commissioner, T.C. Memo. 1994-350; see also Reed v. Commissioner, T.C.

Memo. 1997-388; Markham v. Commissioner, T.C. Memo. 1991-430; Eschweiler v. Commissioner, T.C. Memo. 1989-601.

Petitioner bears the burden of proving that respondent's determination of liability for the self-employment tax is erroneous. See Rule 142(a). Petitioner did not present any evidence relating to this issue at trial and does not address the issue in his posttrial briefs. Accordingly, we sustain respondent's determination that petitioner is liable for the self-employment tax with respect to the income he realized in 1983 from selling marijuana.

Deduction for Legal Expenses

On Schedule A attached to his 1983 tax return, petitioner claimed a deduction of $7,500 for legal expenses. This deduction is listed on petitioner's return as "LEGAL FEES PROTECTION OF INCOME". Respondent disallowed this deduction on the ground that petitioner failed to establish either that the expenses were actually incurred or that they are deductible under section 212. In his posttrial briefs, petitioner states that he did not keep records relating to the claimed deduction, and that the attorney who rendered the legal services has since died. Petitioner argues that "Respondent never presented

any evidence at trial concerning a $7,500 dollar [sic] legal deduction in 1983."

Respondent's determinations are presumed correct, and petitioner bears the burden of proving that such determinations are erroneous. See Rule 142(a). Moreover, every taxpayer is required to maintain adequate records to substantiate both the existence and amount of any deduction or credit claimed. Sec. 6001; Smith v. Commissioner, T.C. Memo. 1997-544; sec. 1.6001-1(a), Income Tax Regs. In this case, petitioner bears the burden of proving that he is entitled to the claimed deduction. See Rule 142(a). Because petitioner failed to present any evidence to substantiate the claimed deduction, we find that petitioner has failed to meet his burden of proof, and we sustain respondent's disallowance of this deduction.

Additions to Tax for Fraud

Respondent determined that petitioner is liable for the additions to tax for fraud prescribed by section 6653(b)(1) and (2) with respect to his 1983 return. Section 6653(b)(1), as in effect for 1983, imposed an addition to tax equal to 50 percent of any underpayment of tax, any part of which is attributable to fraud. Section 6653(b)(2) imposed an addition to tax equal to

50 percent of the interest payable under section 6601 with respect to the portion of the underpayment which is attributable to fraud. "Fraud" for these purposes is defined as an intentional wrongdoing designed to evade tax believed to be owing. See Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); Petzoldt v. Commissioner, supra at 698; Estate of Pittard v. Commissioner, 69 T.C. 391 (1977).

Respondent bears the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971). To meet this burden, respondent must show that an underpayment of tax exists, and that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); see Parks v. Commissioner, 94 T.C. 654, 660 (1990); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Castillo v. Commissioner, supra at 408-409; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Acker v. Commissioner, 26 T.C. 107, 112 (1956). Respondent need not establish that

petitioner's primary motivation was tax evasion but must show that a "tax-evasion motive played any part" in his conduct, including conduct designed to conceal another crime. See Recklitis v. Commissioner, supra at 909 (quoting Worcester v. Commissioner, 370 F.2d 713, 717 (1st Cir. 1966), vacating T.C. Memo. 1965-199).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See Castillo v. Commissioner, supra at 409; Rowlee v. Commissioner, supra at 1123; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be imputed or presumed, but must be established by independent evidence. See Recklitis v. Commissioner, supra at 910; Castillo v. Commissioner, supra; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). However, because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence, including the implausibility of the taxpayer's explanations. See Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951; Castillo v. Commissioner, supra; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984);

Gajewski v. Commissioner, supra at 200.  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  See Spies v. United States, 317 U.S. 492 (1943); Castillo v. Commissioner, supra; Gajewski v. Commissioner, supra; Stone v. Commissioner, supra at 223-224.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These "badges of fraud" include:  (1) Understating income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of income or assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal activities; (8) an intent to mislead which may be inferred from a pattern of conduct; (9) lack of credibility of the taxpayer's testimony; (10) filing false documents; and (11) dealing in cash.  See Spies v. United States, supra at 499; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, supra at 910.  Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors may be persuasive evidence of fraud.

See <u>Solomon v. Commissioner</u>, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  A taxpayer's intelligence, education, and tax expertise are also relevant for purposes of determining fraudulent intent. See <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); <u>Iley v. Commissioner</u>, 19 T.C. 631, 635 (1952).

Respondent contends that the following facts, taken as a whole, establish that the entire underpayment of tax for 1983 was attributable to fraud:  (1) The unreported income was derived from an illegal activity; (2) petitioner failed to maintain or produce adequate records of his drug smuggling income; (3) he dealt exclusively in cash; (4) he never informed his return preparer of his income from the illegal activity; (5) he made inconsistent statements regarding the amount of money he earned from the activity; (6) there is a large discrepancy between petitioner's actual income and the income reported on his return; and (7) petitioner structured his bank deposits in such a manner as to avoid the filing of Currency Transaction Report forms with the Internal Revenue Service.

We agree with respondent.  Petitioner failed to report a very large portion of his income for 1983 in an attempt

to conceal the illegal activity which produced that income. See Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148. Moreover, petitioner has not shown that he maintained adequate books and records regarding his involvement in the illegal activity. His failure to maintain adequate books and records is indicative of fraud. See Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987); Gajewski v. Commissioner, supra at 200. The fact that petitioner dealt in large amounts of cash and his failure to inform his return preparer of his illegal income also evidence fraud. See Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37. We also find that petitioner's lack of credibility, his inconsistent testimony regarding the marijuana smuggling activity, and his general evasiveness evidence fraudulent intent. See Bradford v. Commissioner, supra at 307; Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Welker v. Commissioner, T.C. Memo. 1997-472. In addition, petitioner instructed Mr. Nelson to deposit the proceeds of the illegal activity in bank accounts in amounts of less than $10,000 each for the purpose of concealing such deposits from respondent. See Parks

v. Commissioner, supra at 665; Estate of Temple v. Commissioner, 67 T.C. 143, 162-163 (1976); Burke v. Commissioner, T.C. Memo. 1995-608.

We find that the circumstances of this case, taken as a whole, clearly and convincingly establish that petitioner acted with the requisite fraudulent intent, and that the entire underpayment of tax for 1983 is due to fraud, as determined by respondent.  Accordingly, we sustain respondent's determination that petitioner is liable for the additions to tax for fraud prescribed by section 6653(b)(1) and (2).

Addition to Tax for Substantial Understatement of Liability

Respondent also determined that petitioner is liable for the addition to tax for substantial understatement of liability prescribed by section 6661.  Section 6661, as in effect for 1983, imposed an addition to tax equal to 25 percent of any underpayment which is attributable to a "substantial understatement of income tax".  See Pallottini v. Commissioner, 90 T.C. 498 (1988).  A "substantial understatement of income tax" is defined as any understatement which exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000.  See sec. 6661(b)(1).  Petitioner bears

the burden of proving that respondent's determination is incorrect.  See Rule 142(a).

Petitioner failed to address this issue in his post-trial briefs and has not shown any reason why he is not liable for the addition.  Accordingly, we sustain respondent's imposition of the addition to tax for substantial understatement of liability under section 6661.

## Period of Limitations

Petitioner maintains that the period of limitations on assessment and collection with respect to his income tax for 1983 expired before respondent issued the subject notice of deficiency.  Section 6501(a) generally imposes a 3-year period of limitations on assessment and collection of tax.  Section 6501(a) provides as follows in this regard:

> SEC. 6501(a).  General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

There is an exception to this 3-year period in the case of a "false or fraudulent return with the intent to

evade tax".  See sec. 6501(c)(1); <u>Lowy v. Commissioner</u>, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32; <u>Colestock v. Commissioner</u>, 102 T.C. 380, 385 (1994).  Section 6501(c) provides as follows in this regard:

> (1) False Return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

Because we have sustained respondent's determination that petitioner's underpayment of tax for 1983 was attributable to fraud, the 3-year period of limitations is inapplicable to that return.  See <u>Lowy v. Commissioner</u>, <u>supra</u> at 520; <u>Colestock v. Commissioner</u>, <u>supra</u> at 285; <u>Beauchamp v. Commissioner</u>, T.C. Memo. 1997-393.  Pursuant to section 6501(c)(1), a tax deficiency with respect to petitioner's 1983 return may be assessed at any time. Accordingly, we reject petitioner's argument that the period of limitations expired prior to the time respondent issued the subject notice of deficiency.

In light of the foregoing,

<u>An appropriate order will</u>
<u>be issued and a decision</u>
<u>will be entered for</u>
<u>respondent</u>.