T.C. Memo. 1998-141


UNITED STATES TAX COURT


RAMON AND IRMA ORTIZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6202-95.                    Filed April 16, 1998.


Ramon Ortiz, pro se.

<u>Joanne B. Minsky</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes and penalties as follows:

| Year | Deficiency | Penalties Sec. 6663 |
|------|-----------|---------------------|
| 1991 | $15,459 | $11,594 |
| 1992 | 32,657 | 24,493 |

In the alternative to the fraud penalties, respondent asserts in the answer to the petition that petitioners are liable for the accuracy-related penalties for 1991 and 1992 pursuant to section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues to be decided are as follows:

(1)  Whether petitioner Ramon Ortiz had substantial amounts of unreported self-employment income for 1991 and 1992 from his wholesale used car business;

(2)  whether petitioners received additional interest income for 1991 and 1992 in the respective amounts of $3,500 and $3,000;

(3)  whether petitioners are entitled to a capital loss in 1991 in the amount of $3,000;

(4)  whether petitioner Ramon Ortiz is liable for additional self-employment taxes for 1991 and 1992;

(5) whether petitioner Irma Ortiz is liable for fraud penalties under section 6663 for 1991 and 1992; and

---

[1]  Petitioners concede that they received interest of $18,000 in 1991 and $4,000 in 1992 which was not reported on their Federal income tax returns.  Respondent concedes that $25,000 of petitioners' unreported income for 1992 is not subject to self-employment tax.  These concessions, along with two computational adjustments for 1992 relating to a reduction in itemized deductions and the recapture of a claimed earned income credit, can be given effect in the Rule 155 computations.

(6) whether petitioner Ramon Ortiz is liable for fraud penalties under section 6663 for 1991 and 1992;

(7) whether, alternatively, petitioners are liable for the accuracy-related penalties for 1991 and 1992.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation with attached exhibits are incorporated herein by this reference.

Petitioners Ramon Ortiz (Mr. Ortiz) and Irma Ortiz (Mrs. Ortiz) resided in Orlando, Florida, at the time they filed their petition in this case. They were formerly residents of Puerto Rico, where Mr. Ortiz owned and operated a pharmacy which he sold in 1987. In July 1988, petitioners moved to Orlando, Florida, where they purchased a house.

Bank Accounts

During 1991 and 1992 and for prior years, petitioners maintained a personal checking account at Barnett Bank. Mr. Ortiz maintained a business checking account in the name of R&X Auto Sales, a sole proprietorship, at Osceola National Bank.

Sale of Petitioners' House in Puerto Rico

In 1974, petitioners purchased a parcel of land in Puerto Rico for $18,000. In 1974 or 1975 they had a house built on this land. Although the record does not show the actual cost of building the house, petitioners' total investment in the property

exceeded $75,000. They continued to own the property when they moved to the United States. In September 1988, petitioners sold the house for $75,000 plus interest to Andres Rivera Rodriguez (Mr. Rodriguez), who paid them $25,000 in principal and $18,000 in interest in 1991 and $50,000 in principal and $4,000 in interest in 1992. Petitioners received the $25,000 in 1991 in four cash payments, which were deposited in the business bank account at Osceola National. The exact amount of $50,000 was deposited on October 13, 1992, in Mr. Ortiz' business bank account. Some of the interest payments received from Mr. Rodriguez, $3,500 in 1991 and $3,000 in 1992, were by checks which were deposited in petitioners' personal bank account. The remainder of the payments received in 1991 and 1992 was apparently received in cash.

Mrs. Ortiz

In 1991 and 1992, Mrs. Ortiz worked as a pharmacist for Rite Aid and GM Drug Company. She received wages of $19,291 in 1991 and $12,938 in 1992. The Federal income tax withheld was $1,560 in 1991 and $1,029 in 1992. The checks she received from these employers were deposited in petitioners' personal bank account. The amounts received by Mrs. Ortiz were reported by her as gross income on petitioners' Federal income tax returns for 1991 and 1992. She also received de minimis amounts from Como Pharmacy that were not reported and not determined by respondent to be self-employment income.

Mrs. Ortiz was not involved in her husband's wholesale used car business, R&X Auto Sales.

## Mr. Ortiz and R&X Auto Sales

Mr. Ortiz was in the wholesale used car business and operated R&X Auto Sales. Most of his business involved purchasing automobiles at auctions and then selling them to dealers in Puerto Rico. This business required Mr. Ortiz to handle checks in amounts as high as $30,000. He occasionally sold used cars to local individuals. Mr. Ortiz deposited car payments from individuals into petitioners' personal bank account. He also deposited rent payments from Angels Transport into petitioners' personal bank account during 1991 and 1992. Angels Transport was a business that did mechanical work on some of petitioners' property in Orlando.

Mr. Ortiz had a license that allowed him to purchase automobiles at auctions. As part of his business, he allowed other salesmen to purchase automobiles with his license. Mr. Ortiz charged the salesmen $100 for each car they purchased with his license. The salesmen would pay him for the price of the automobiles purchased in addition to the $100 fees. The money received from these buyers was included by respondent in determining the income of Mr. Ortiz for 1991 and 1992, and the price paid for the cars purchased by the buyers was included in cost of goods sold.

## Alvarado Transactions

Angel Luis Alvarado (Mr. Alvarado) sent Mr. Ortiz a $14,100 check in 1991 and a $13,000 check in 1992, both drawn on the account of Asomante Auto Sales, a company in Puerto Rico that was a customer of R&X Auto Sales. When submitted to the bank, the checks were marked with notations about advances for automobiles. After the checks were processed through Banco Popular in Puerto Rico and returned to Mr. Alvarado, the notations on the checks were changed by Mr. Alvarado to read "prestamo", the Spanish word for loan. Mr. Ortiz repaid Mr. Alvarado by sending him used cars. He retained part of the advances as his "commission". No documents were executed to formalize these advances. No interest was paid by Mr. Ortiz on the advances.

## Loan From Luna

On May 10, 1991, Mr. Ortiz received a $20,000 bank check as a loan from Anibal Rivera Luna (Mr. Luna), who is related to Mrs. Ortiz. On May 15, 1991, petitioners purchased four lots in Marydia, Florida, as investment property. Petitioners paid $29,767.24 at the closing. Petitioners did not deposit an amount of $20,000 into their personal bank account or the business bank account in May 1991. Petitioners did not withdraw the amount of $29,767.24 from either account in May 1991.

## Income Tax Returns

Mr. Ortiz provided his accountant and return preparer, Paul Solano (Mr. Solano), with information and data pertaining to R&X

Auto Sales and the business bank account. This information was used by Mr. Solano in preparing the Schedule C (Profit or Loss From Business) for R&X Auto Sales attached to petitioners' Federal income tax returns for 1991 and 1992. However, Mr. Solano was unaware that petitioners had a personal bank account at Barnett Bank.

In the Schedule C for 1991, Mr. Ortiz, operating as R&X Auto Sales, reported gross sales of $1,384,446, cost of goods sold of $1,319,153, gross income of $65,293, total expenses of $56,535, and a net profit of $8,758.

In the Schedule C for 1992, Mr. Ortiz reported that R&X Auto Sales had gross sales of $3,303,511, cost of goods sold of $3,085,454, gross income of $55,755, total expenses of $46,565, and a net profit of $9,190.

On their Federal income tax return for 1991 petitioners reported total taxable income of $25,049 and total tax of $2,433. On their 1992 return petitioners reported total taxable income of $22,163 and total tax of $2,075.

Petitioners did not report the interest they received from Mr. Rodriguez ($18,000 in 1991 and $4,000 in 1992) as income on their Federal income tax returns for those years. However, petitioners provided respondent's agent with a reconstructed 1991 Puerto Rico income tax return that reported $18,000 as interest income. The Department of the Treasury, Commonwealth of Puerto Rico, provided respondent with a certified copy of petitioners'

1987 Puerto Rican tax return and a certificate of nonfiling for petitioners for 1988 through 1994.  Petitioners do not recall having filed tax returns in Puerto Rico after 1988.

Petitioners reported adjusted gross income of $32,041 on their 1990 Federal income tax return.  That return did not report a capital loss, and petitioners did not make an election to carry forward a net operating loss.

Respondent's Determination of Unreported Income

In the audit of the income tax returns, the revenue agent deemed petitioners' records to be inadequate.  Consequently, he computed their taxable income for 1991 and 1992 by using a bank deposits analysis.  He took the total deposits from the personal and business bank accounts and combined them.  He then subtracted amounts to account for interbank transfers, gifts, loans, redeposits, and other nontaxable items to determine unreported income.  The revenue agent who performed the bank deposits analysis requested an extension of time to complete it but the extension was not granted by petitioners.  At trial the agent stated that he thought the determination was, in his best estimate, correct.

In the notice of deficiency, respondent determined unreported income by the bank deposit analysis as follows:

| Bank Deposit Analysis | 1991 | 1992 |
|---|---|---|
| Deposits to Business Account--Osceola | $1,536,251 | $3,598,451 |
| Deposits to Personal Account--Barnett | 67,066 | 52,403 |

| | | |
|---|---|---|
| Total Deposits Per Bank Statements | 1,603,317 | 3,650,854 |
| Less: | | |
| Loans | | 105,000 |
| Loans | | 20,000 |
| Redeposits to Bus. Acct. | 77,823 | 102,241 |
| Sales Tax | 5,783 | |
| Refunds | 64,481 | |
| Transfers from Bus. Acct. | | 4,300 |
| Transfers from Pers. Acct. | 1,000 | 1,800 |
| Redeposits from Pers. Acct. | | 920 |
| Reported Wages | 19,291 | 12,938 |
| 1990 Tax Refund | 1,079 | |
| Loan or Transfer-Eckerd CU | 418 | |
| Bank Deposit Analysis | 1991 | 1992 |
| Credit Card Advance | 1,000 | |
| Credit Card Loan | 5,000 | |
| Insurance Payment | 142 | |
| Non-Self Employment Deposits | 3,500 | 3,000 |
| Total | 1,423,800 | 3,400,655 |
| Add Back | | |
| Withheld Taxes | 1,560 | 802 |
| Withheld FICA | 1,476 | 1,217 |
| Total Sales Per Bank Analysis | 1,426,836 | 3,402,674 |
| Total Sales Per Return | 1,384,446 | 3,303,511 |
| Total Unreported Income | 42,390 | 99,163 |

Respondent's determinations of unreported income for 1991 and 1992 by using a bank deposits analysis were not accurate in some respects.  The sources of certain amounts of the deposits were from nontaxable income items.

OPINION

Issue 1.  Unreported Income

Utilizing the bank deposits method of income reconstruction, respondent determined that petitioners had unreported income of $42,390 and $99,163 for 1991 and 1992, respectively.  Petitioners contend that some of the deposits constituted loans or other nontaxable items.  In particular, they assert that the amounts received from Mr. Rodriguez in 1991 and 1992 as principal payments on the sale of their Puerto Rico house were nontaxable items.  They also assert that the amounts they received from Mr. Alvarado and Mr. Luna were loans which were not income subject to tax under section 61(a).

Under section 6001, a taxpayer is required to maintain adequate records of taxable income.  In the absence of adequate books and records, the Commissioner may reconstruct a taxpayer's income by any reasonable method that clearly reflects income.  Sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954); Harper v. Commissioner, 54 T.C. 1121, 1129 (1970).  In this case respondent used the bank deposits method to reconstruct petitioners' income and to determine the amount of unreported income for 1991 and 1992.  The bank deposits method is based on the principle that a bank deposit is prima facie evidence of income.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  This Court has repeatedly accepted this method of income reconstruction when a taxpayer has inadequate books and records

and large bank deposits.  Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), affg. T.C. Memo. 1967-67; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

The deficiency determination is presumed correct.  Welch v. Helvering, 290 U.S. 111, 111 (1933).  Petitioner has the burden of proving that respondent's determination is incorrect.  Rule 142(a); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978); Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), affd. 566 F.2d (6th Cir. 1977).

Here petitioners first argue that respondent's determination should not be sustained because the revenue agent did not have sufficient time to complete his audit, and he said that he only estimated the deficiencies.  Petitioners misunderstood the revenue agent's testimony at trial in which he stated that he requested an extension of time to complete his examination and that the deficiencies determined were, in his best estimate, correct.

In challenging respondent's income reconstruction, there is evidence in this record that supports petitioners' claim that some of the deposits were from nontaxable sources.  The evidence primarily consists of Mr. Ortiz' testimony, bank account statements, canceled checks, and other documents.  On brief, respondent stresses that Mr. Ortiz was not able to readily trace nontaxable payments received to specific bank deposits.  We are

satisfied that he made a sufficient showing to match nontaxable funds to some of the deposits. If the funds are nontaxable, they should be removed from unreported income determined by respondent.

A. Payments Received on Sale of Puerto Rico House

Petitioners contend that deposits attributable to the principal payments they received from Mr. Rodriguez in the amounts of $25,000 and $50,000 for 1991 and 1992, respectively, on the sale of their house in Puerto Rico should not be included in determining their unreported income for those years. We agree. We are satisfied, based on Mr. Ortiz' testimony, that he had invested more in the property than the $75,000 Mr. Rodriguez agreed to pay for it in 1988. Consequently, we find that $25,000 received in 1991 and $50,000 received in 1992, which amounts were included in the bank deposits, are nontaxable and must be removed from the unreported income determined by respondent.

B. Checks Received From Mr. Alvarado

Petitioners claim that the $14,100 and $13,000 checks received from Mr. Alvarado in 1991 and 1992 were intended by the parties to be loans. We disagree. Considering that the checks were drawn from the account of Asomante Auto Sales, a customer of R&X Auto Sales, that the checks originally contained notations about advances for automobiles, and that Mr. Ortiz provided cars to repay Mr. Alvarado for the checks, we are persuaded that the form and substance of the transactions were automobile sales, not

loans.  Accordingly, we conclude that respondent correctly included the amounts of these checks as income in the bank deposits analysis.

### C.  Loan From Mr. Luna

Petitioners argue that respondent should have reduced the amount determined to be unreported income in 1991 by $20,000 to account for the loan they received from Mr. Luna in May 1991.  In our opinion an adjustment is not warranted because petitioners failed to provide any evidence that they deposited $20,000 from this loan into either of the bank accounts.  Five days after receiving the $20,000 loan, petitioners paid $29,767.24 to close on the purchase of investment property in Marydia, Florida. Because their bank records do not show that petitioners withdrew $29,767.24 in May 1991, we think respondent's explanation that petitioners used the $20,000 loan for closing costs on this property is reasonable.

### D.  Interest Payments Received From Mr. Rodriquez

Petitioners have conceded that the $18,000 and $4,000 interest payments they received in 1991 and 1992, respectively, from Mr. Rodriguez from the sale of their house in Puerto Rico are taxable income to them in those years. The interest deposits of $3,500 in 1991 and $3,000 in 1992 were not included in unreported income, and such amounts should not be removed from the unreported income determined by respondent.

E.  License Use

Petitioners assert that $39,163 of their unexplained deposits for 1992 is attributable to salesmen's use of Mr. Ortiz' license to purchase automobiles.  They argue that only money attributable to the $100 fees that Mr. Ortiz charged the salesmen for each car purchased using this license should be taxed. However, petitioners failed to substantiate any of these salesmen's purchases and provided no information indicating how many $100 fees they received.  Petitioners also failed to show that money received from any such transactions was deposited into either of the bank accounts.

F.  Conclusions as to Unreported Income

In sum, we hold that Mr. Ortiz had unreported self-employment income from his wholesale used car business of $17,390 in 1991 and $49,163 in 1992. Petitioners had unreported interest income of $18,000 in 1991 and $4,000 in 1992.

Issue 2.  Additional Interest Income

We hold that petitioners did not receive additional interest income of $3,500 in 1991 and $3,000 in 1992.  These amounts are included in the interest payments petitioners have conceded they received from Mr. Rodriguez.  See supra Issue 1D.

Issue 3.  Capital Loss for 1991

Under section 1211 a taxpayer other than a corporation is limited to $3,000 in net capital losses in any given tax year.

Under section 1212 any net capital losses that are disallowed as a result of the limitation in section 1211 may be carried forward to the next taxable year. In this case petitioners did not report a capital loss in 1990, but they have claimed a capital loss carryover to 1991. They have also claimed that the loss was actually a net operating loss carryforward. However, petitioners did not elect on their 1990 return to carry forward a net operating loss, as required by section 172(b)(3), and they have failed to substantiate that they experienced a loss in 1990 or 1992. Petitioners have the burden of proving entitlement to a capital loss or net operating loss. Rule 142(a); Burke v. Commissioner, T.C. Memo. 1995-608. They failed to do so. Therefore, we sustain respondent's disallowance of the claimed capital loss.

Issue 4. Self-Employment Taxes and Adjustments

Respondent determined that Mr. Ortiz' unreported income in 1991 and 1992 was subject to self-employment taxes under section 1401 and to an adjustment in his self-employment tax deduction in each year.

Section 1401 imposes a tax on a taxpayer's self-employment income. Self-employment income includes the net earnings from self-employment derived by an individual during the taxable year. Sec. 1402(b). Net earnings from self-employment means gross income derived by an individual from any trade or business carried on by the individual, less allowable deductions

attributable to the trade or business, plus certain items not relevant here. Sec. 1402(a). The term "trade or business" for purposes of the self-employment tax generally has the same meaning it has for purposes of section 162. Sec. 1402(c). Thus, to be engaged in a trade or business within the meaning of section 1402(a), an individual must be involved in an activity with continuity and regularity, and the primary purpose for engaging in the activity must be for income and profit. Commissioner v. Groetzinger, 480 U.S. 23 (1987). Whether an individual is carrying on a trade or business requires an examination of all the facts in each case. Higgins v. Commissioner, 312 U.S. 212, 217 (1941). These provisions are to be broadly construed to favor treatment of income as earnings from self-employment. Hornaday v. Commissioner, 81 T.C. 830, 834 (1983).

Clearly Mr. Ortiz received unreported self-employment income in 1991 and 1992 from his wholesale used car business. Having found that the amounts were $17,390 and $49,163, respectively, it follows that he is liable for self-employment taxes under section 1401 on those earnings. However, he is entitled to corresponding increases in his self-employment tax deductions for 1991 and 1992. These adjustments are computational.

Issues 5 and 6. Fraud Penalties

Respondent determined that both petitioners are liable for fraud penalties pursuant to section 6663 for the years in issues.

To the contrary, petitioners assert that they are not liable for the penalties.

### A.  Fraud Generally

Under section 6663(a), if any part of any underpayment of tax is due to fraud, a 75-percent penalty is added to the portion of the underpayment attributable to fraud.  Respondent has the burden of proving that some portion of an underpayment is attributable to fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971).  However, once respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, unless the taxpayer establishes otherwise. Sec. 6663(b).

To meet the burden of proof, respondent must establish:  (1) That the taxpayer has underpaid his or her taxes for each year; Parks v. Commissioner, 94 T.C. 654, 660 (1990); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969); and (2) that some part of the underpayment was due to the taxpayer's intent to conceal, mislead, or otherwise prevent the collection of such taxes.  Sec. 6653(b); Scallen v. Commissioner, 877 F.2d 1364, 1369 (8th Cir. 1989), affg. T.C. Memo. 1987-412; Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 660-661; Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Rowlee v. Commissioner, 80 T.C. 1111 (1983).

Fraud may not be found under "circumstances which at the most create only suspicion." Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); Katz v. Commissioner, 90 T.C. 1130, 1144 (1988). Merely underreporting or failing to report income is insufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. However, a pattern of consistent underreporting of income may be strong evidence of fraud, especially when accompanied by other circumstances showing intent to conceal. Mazzoni v. Commissioner, T.C. Memo. 1970-37, affd. 451 F.2d 197, 202 (3d Cir. 1971); see Holland v. United States, 348 U.S. at 137. Fraud is an intentional wrongdoing by a taxpayer that is designed to evade tax believed to be owing. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record, DiLeo v. Commissioner, 96 T.C. at 874; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), and the taxpayer's entire course or pattern of conduct. Spies v. United States, 317 U.S. 492, 499 (1943); Stone v. Commissioner, supra at 224; Otsuki v. Commissioner, supra at 105-106;. Because direct proof of fraudulent intent is rarely available, fraud may be shown by circumstantial evidence and reasonable inferences drawn from the facts. Miller v. Commissioner, 94 T.C. 316, 333 (1990); Stephenson v.

Commissioner, 79 T.C. 995 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984); Gajewski v. Commissioner, supra at 199. However, fraud should not be imputed or presumed, Beaver v. Commissioner, 55 T.C. 85, 92 (1970), and a finding of fraud may not be bootstrapped to a taxpayer's failure to prove the Commissioner's deficiency determination erroneous. Drieborg v. Commissioner, 225 F.2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court. Parks v. Commissioner, supra at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971).

When allegations of fraud are intertwined with unreported and indirectly reconstructed income, the Commissioner can prove an underpayment by one of two alternate methods. United States v. Massei, 355 U.S. 595 (1958). First, a likely source of the unreported income can be proved. Holland v. United States, supra; DiLeo v. Commissioner, supra at 873-874; Nicholas v. Commissioner, 70 T.C. 1057 (1978); Otsuki v. Commissioner, supra at 105-106. Second, if the taxpayer alleges a nontaxable source, the Commissioner can disprove the alleged source. United States v. Massei, supra; Kramer v. Commissioner, 389 F.2d 236, 239 (7th Cir. 1968), affg. T.C. Memo. 1966-234; DiLeo v. Commissioner, supra at 873-874. The Commissioner may disprove an alleged specific nontaxable source of income by showing that the reconstruction of income is accurate and that the taxpayer's

allegations are inconsistent, implausible, and not supported by objective evidence.

### B. Indicia of Fraud

There are certain indicia that can lead to a decision as to fraud. They include: (1) Understatements of income, Holland v. United States, supra at 137; Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; (2) inadequate books and records, Merritt v. Commissioner, supra at 487; Edwards v. Commissioner, T.C. Memo. 1995-77; (3) false entries on or alterations of documents, Spies v. United States, supra at 499; (4) failure to file tax returns; (5) implausible or inconsistent explanations of behavior; Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); (6) concealment of income or assets, Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; (7) dealing in cash; (8) failure to cooperate with tax authorities, Bradford v. Commissioner, supra at 307; (9) filing false documents, Stephenson v. Commissioner, supra at 1007; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); and (10) failing to give complete information to the tax return preparer, Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. This list is nonexclusive. See Miller v. Commissioner, supra at 334. Although no single factor may be necessarily sufficient to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of

fraud.  <u>Solomon v. Commissioner</u>, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

 C.  <u>Fraud Penalties--Mrs. Ortiz</u>

 Fraud is not imputed from one spouse to the other.  <u>Stone v. Commissioner</u>, 56 T.C. at 227-228.  Section 6663(c) provides that, in the case of a joint income tax return, the imposition of the fraud penalty under section 6663(a) does not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse.  Respondent has the burden of proving by clear and convincing evidence that Mrs. Ortiz committed fraud. There is no evidence in this record that Mrs. Ortiz displayed a fraudulent intent to evade taxes during the years in issue. There is nothing to show that she was involved in her husband's wholesale used car business or had any direct knowledge of its operations.  She worked as a pharmacist in 1991 and 1992.  She received wages and reported them as income for tax purposes. While it is likely that she was not completely unaware of her husband's activity, that fact alone cannot sustain a finding of fraud.  It is true that there was some unreported interest income in 1991 and 1992, but those omissions do not justify a finding of fraud.  Thus, we conclude that Mrs. Ortiz is not liable for the fraud penalties, although she is jointly and severally liable for any deficiencies resulting from the findings and conclusions reached herein.  Mrs. Ortiz has not raised the issue, or offered any evidence, to show that she should be

considered an innocent spouse within the meaning of section 6013(e). Therefore, we decline to apply that section.

### D. Fraud Penalties--Mr. Ortiz

Whether Mr. Ortiz is liable for fraud penalties is more troublesome. The evidence is conflicting, and the indicia of fraud are weak. To be sure, his self-employment income from the wholesale used car business was underreported in both years and, according to the revenue agent who audited his returns, the books and records of the business were not entirely adequate. Therefore, the agent resorted to a bank deposits analysis in reconstructing the income of the business. As we have found, that analysis was flawed in certain respects. Furthermore, the records and data Mr. Ortiz furnished to Mr. Solano, his accountant and return preparer, were apparently sufficient to enable Mr. Solano to determine business gross sales, cost of goods sold, and expenses.

Although respondent argues that Mr. Ortiz presented altered notations on checks received from Mr. Alvarado, it was not Mr. Ortiz who changed the notations from "advances for autos" to "prestamo", the Spanish word for loan. Mr. Alvarado made the changes after the checks cleared his Puerto Rican bank.

Because of Mr. Ortiz' difficulty with the English language, his testimony was given through an interpreter. He was not represented by counsel. At times he appeared not to fully

understand the questions asked by respondent's counsel on cross-examination. Nonetheless, he was candid, not evasive.

Considering the totality of the facts and circumstances contained in this record, we conclude that respondent has not carried the heavy burden of proving fraud by clear and convincing evidence. Consequently, we hold for Mr. Ortiz on this issue.

Issue 7. Accuracy-Related Penalties

The Court is satisfied, based on this record, that respondent's alternative determination that petitioners are liable for the accuracy-related penalties under section 6662 for both years should be sustained. Section 6662(a) provides generally for a penalty of 20 percent of the portion of an underpayment to which the section applies.

Section 6662(b) lists five categories in which an underpayment of tax will be subjected to the penalty, including negligence. "Negligence" includes any failure to make a reasonable attempt to comply with the Internal Revenue Code. Sec. 6662(c). Petitioners underreported their income for the years in issue. In short, they did not do what a reasonable and ordinary prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners presented no evidence to show that their underpayments were due to reasonable cause and that they acted in good faith with respect to such underpayments. Sec. 6664(c).

We conclude that their actions constituted negligence as defined in section 6662(c).  Accordingly, respondent is sustained on this issue.

To reflect concessions and our conclusions with respect to the disputed issues,

<u>Decision will be entered</u>

<u>under Rule 155</u>.